UTAH POWER & LIGHT CO. v. PROVO CITY et al.
(GENERAL CONTRACTORS ASS'N OF UTAH,
Intervener).

No. 5875. Decided December 31, 1937. (74 P. 2d 1191.)

Rehearing denied May 16, 1938.

*Shirley P. Jones, George R. Corey,* and *Calvin Behle,* all of Salt Lake City, and *Geo. W. Worthen,* of Provo, for plaintiff.

*Elias Hansen,* of Salt Lake City, *Stuart P. Dobbs,* of Ogden, and *Geo. S. Ballif,* and *I. E. Brockbank,* both of Provo, for defendants.

*Badger, Rich & Rich,* of Salt Lake City, for intervener.

WOLFE, Justice.

The issues raised in this case arise from the pleadings in a suit for a writ of prohibition by the plaintiff to prevent the defendant commissioners of Provo City from proceeding with a written contract to sell the city's bonds for the purpose of acquiring or constructing an electric light and power system for the city. The General Contractors Association of Utah was permitted to intervene in support of the writ of prohibition on the ground that the required statutory provisions regarding the advertising and letting of bids had not been followed. Walter P. Whitehead, one of the commissioners of Provo City, who was opposed to the building or acquisition of the power plant, answered supporting the position of the power company.

The facts preceding the suing out of a writ of prohibition and certiorari are as follows: On August 11, 1936, two initiative petitions were filed with I. G. Bench, city recorder of Provo City (hence the joining of Mr. Bench in the petition) containing the appropriate number of signatures and properly verified. One of these petitions asked that the "Bond Ordinance" be referred, the other that the "Construction Ordinance" be referred. As provided by the initiative and referendum law, the ordinances proposed by the initiators were considered by the commissioners and by a two to one vote—Commissioner Whitehead voting in the

negative—were ordained. The city commission, however, went further than this. It passed an ordinance to refer to the people of the city for their decision these bond and construction ordinances. Provision is made for such reference in the initiative and referendum law, Rev. St. 1933, 25-10-1 et seq. A special election was called for and held on October 13, 1936. The ordinances were voted on separately at said election after much discussion of them from the rostrum and among the people, through the press and by the circulation of literature. The approval of the ordinances was vigorously opposed by the plaintiff. Both ordinances were approved by narrow margins.

Briefly, the bond ordinance provided for the sale to John Nuveen & Co. of Chicago of electric power and light bonds of Provo City in the amount of $850,000 par value, to bear interest at $4\frac{1}{2}$ per cent and to be sold at par and accrued interest. The defendants contend these bonds are what are known as special revenue bonds, i. e., that only the income from the plant to be constructed from the proceeds of the bonds can be looked to for the payment of their principal and interest. Plaintiff contends that certain provisions in the contract indirectly make them a charge on the general revenue. On resolution of this issue depends the finding as to whether the special fund doctrine hereinafter considered applies if we decide to adhere to that doctrine. These provisions will be found discussed and considered in detail in the opinion of Mr. Justice LARSON.

The so-called construction ordinance provides for a contract between Provo City and the Ulen Contracting Corporation by which the latter agrees to draw plans and specifications to be approved by the city engineer for the proposed electric light and generating plant and distributing system, to supervise and direct the purchase of the necessary materials and construction of the proposed power plant and distributing system. Other and more detailed provisions of this contract are discussed and considered in the opinion of Mr. Justice LARSON. Naturally the money to

pay for the construction is to come from the proceeds of the sale of the bonds or the Ulen Corporation is to take the bonds on account of payment.

It should be noted that both ordinances simply provided for an acceptance of proposals by Nuveen & Co. and the Ulen Corporation. They did not submit contracts conditionally executed to become absolute on the approval of the people. It appears to us it is important to keep this fact in mind when the opinion of Mr. Justice LARSON is read.

It is admitted that the cost of construction of this plant and distributing system could not be paid out of the anticipated general revenues which for 1936 were approximately $171,000. It is also admitted that, if the city took on an obligation to pay the $850,000 bond issue at all events, it would exceed its constitutional debt limit.

Many of the steps taken by the commissioners coincided with the procedure outlined by the so-called Granger Act, chapter 22, Laws of Utah, Second Special Session 1933. But at least two of the main provisions specified by the Granger Act were not followed, to wit, that of section 3, wherein it was required to obtain a comprehensive estimate of a competent engineer, approved by the state engineer, and that of requiring the special revenue bonds to be sold on bid only after advertisement.

The bond ordinance provides for the sale to John Nuveen & Co. of electric power and light revenue bonds of Provo City to bear interest at 4½ per cent per annum. Certain provisions pertaining to how the principal and interest of these bonds were to be paid will be set out hereunder for the reason that there is a dispute as to whether they are in reality special revenue bonds. It is the defendants' contention that they are special revenue bonds, whilst plaintiff contends that they are, at least indirectly, a charge on the general funds and thus are taken out of the category of special revenue bonds.

The construction ordinance provides for a contract between Provo City and the Ulen Contracting Corporation.

The latter agrees to draw plans and specifications to be approved by the city engineer for the proposed electric light plant and distributing system and for the purchase of necessary materials and construction of the plant from the proceeds derived from the sale of bonds. The purchase of materials and the construction are subject to the control of the city commission. The amount payable to the Ulen Corporation for services to be rendered is $65,000. In the event the bonds are not sold, the Ulen Corporation is given an option to accept the bonds in payment for its services and the cost of construction of the electric lighting plant and distribution system. For a more detailed recital of the provisions of this contract reference is made to the opinion of Mr. Justice LARSON.

The day following the election, plaintiff applied to this court for a writ prohibiting the defendants from further proceeding in the matter of executing or disposing of the proposed bonds or of proceeding with the Ulen contract. The alternative writ of prohibition was granted with a writ of certiorari in assistance thereof. The ultimate question for this court to decide is as to whether the writ of prohibition shall be dismissed or made permanent. Plaintiff sets out clearly the five propositions which it relies upon in urging that the writ be made permanent. These propositions are, without their subdivisions stated, as follows:

"I. The so-called special fund doctrine is wrong and should not be followed or adhered to in this State.

"II. The contracts and ordinance are void even under the special fund doctrine.

"III. If we are to follow the special fund doctrine in this State, the legislature has prescribed the only method by which cities may embark upon undertakings under it, which method has not been followed by the defendants in this instance.

"IV. That the defendants have not followed the other statutory method of incurring bonded indebtedness, or any other statutory requirements with reference to municipal construction.

"V. The legislature in this State has affirmatively declared the public policy of this State with reference to public utilities and pub-

lic improvements. The special fund doctrine violates these principles of public policy and if adopted would judicially destroy valid legislative declarations."

The General Contractors Association of Utah, permitted to intervene, places its opposition to both purported ordinances on the ground that they are void, and sets out many reasons in support of its contention.

We shall consider in this opinion only questions I, III, and IV propounded by plaintiff. Mr. Justice LARSON in his concurring opinion has so ably covered the other questions raised by plaintiff and intervener that we see no need of touching on them here, and adopt the conclusions, in so far as hereafter qualified, reached by him in regard thereto.

We state at the outset that we adhere to the so-called special fund doctrine. That would ordinarily end any further consideration of that principle in this case, but because of plaintiff's contention that the so-called Granger Act, chapter 22, Laws of Utah Second Special Session 1933, provides the only way in which electric light plants can be acquired or constructed under the special fund doctrine, it is necessary to examine into the nature of that doctrine. If what is denominated as the special fund doctrine is only a natural and reasonable method convenient and appropriate to carry into effect the powers given to a city to acquire or construct an electric light plant and distributing system, which powers are not disturbed by the Granger Act, and what is called a "doctrine" is in reality only a recognition by the courts of the right to use that method in pursuit of the more general power given, then such method is really part of the statutory power given to cities independent of the Granger Act and by the very terms of that act not affected by it. If, on the other hand, the special fund doctrine, as contended for by plaintiff, is a piece of judicial legislation which was intended to be limited and circumscribed by the Granger Act, then the principle in-

volved in the so-called special fund conception cannot be used except as provided in the Granger Act. We therefore examine the nature of this doctrine.

Before the Granger Act was passed in 1933, this court held in *Barnes* v. *Lehi City*, 74 Utah 321, 279 P. 878, 885, that the restrictions placed upon the municipal corporations by the debt limit provisions of the Constitution, article 14, §§ 3, 4, "do not apply to a case where public property is purchased or constructed, and payment therefor is to be made, exclusively from the revenues derived from the property." This language is the heart of the special fund doctrine. And it is not affected by the means employed as long as the earnings are impounded in a special fund "which is expressly pledged for the purpose of maintaining the plant and the payment of the interest and purchase price installments as they accrue under the proposed contract [which] casts no additional burden on the taxpayers of the city." Whether the contract is one of conditional sale, outright purchase paid for by bonds to be paid for solely by revenues derived from services rendered, or some other sound and businesslike method, can make no difference in the principle; nor is the principle affected by the fact that the city contracts to charge a rate calculated to pay operating expenses, depreciation, interest, and sinking fund requirements, where it is still left to future commissions to say what the rate may be. This should not be read as demanding that future commissions must charge such a rate as would be greater than a reasonable rate, if the operating expenses, etc., should demand it. In fact, ordinarily, operating expenses, if reasonable, reasonable depreciation, if costs were reasonable, and interest and sinking fund requirements, if the borrowings were reasonable and founded on reasonable costs, largely enter into the making of a reasonable charge. It still has within its power to determine such reasonable rate. Nor is it affected by the fact that it pledges itself to use and pay rates for like services charged others for electricity for its own purposes out of the general

fund. Whether it purchased from a public utility company, it would be required to pay for these services. The provision is always subject to the constitutional proviso that it could not spend more for such services or any other services or materials than its current revenue would pay for. When it attempted to do so, such is the time when plaintiff may object. In *Fjeldsted* v. *Ogden City*, 83 Utah 278, 28 P. 2d 144, 153, it was stated:

"(c) The bond ordinance requires that 'the reasonable value of all water used by Ogden City for public purposes shall be paid by said City into the Waterworks Fund.' We can see no objection to a municipality, which owns and operates a waterworks system or other utility, adopting as a policy the requirement that the city or its several departments should pay for such of the product or service as is used by the city in its public service, such reasonable rates, uniform in proportion to amount used, as is charged other users or consumers. Indeed, when a public utility is operated by a municipality, its books of account should be so kept that they disclose whether or not the property is self-supporting. The income should be sufficient to pay interest on and principal of the bonds issued or other obligations incurred in the purchase, improvement, or extension of the system, in addition to cost of operation, maintenance, betterments, and replacements. The amendment to Laws Utah 1925, § 794, p. 116, c. 63, contemplates that the system should bear the burden of paying interest on and principal of bonds, the proceeds of which have gone into the system, and that the general taxpayer should only be burdened with the deficiency. Good business principles dictate that such utility be self-supporting so far as possible. That this provision alone does not create a debt within contemplation of the Constitution was held in *Barnes* v. *Lehi City*, supra, where the court said:

" 'The general rule is that such contracts, being for services to be paid for periodically, are merely arrangements to pay for current expenses as they are incurred.'

"The city has not obligated itself to purchase its water from the water department, nor bound itself to take any particular amount of water, but merely to pay for what it uses each year during the life of the bonds. 6 McQuillin on Municipal Corporations, p. 52; 44 C. J. 1130."

To repeat, the Barnes v. Lehi Case laid down unequivocally the rule not to be differentiated because future com-

missions had the choice of carrying through the contract or permitting the seller to take it away on the conditional sale provisions, but covering the larger principle as above set out that the obligation was a charge only against the income from the improvement itself and not against the general taxes. Every commission makes contracts which are binding on future commissions. If they cannot perform because the current revenue will not permit, it is not because they are not binding but because the situation is such as to make it legally impossible to perform.

While the case of *Fjeldsted* v. *Ogden City*, supra, seems at first blush to distinguish the Barnes v. Lehi Case from the Ogden City Case on the grounds that in the former case the "contract as could be abandoned or repudiated at any future time by the governing authorities of the city, and the city would lose nothing of its owned property or income and would be under no obligation to make further payment," it will be seen, on more careful study of the two decisions, that the distinguishing feature was not the method by which the improvements were purchased, but the fact that in the Ogden City Case that portion of the revenue which was derived from the already owned part of the utility was to be diverted into the special fund. At this particular time we have no comment to make on the soundness of the holding in the Ogden City Case and pause with it only for the purpose of pointing out that the fact that a present commission binds a future one to apply income from a newly acquired plant to the payment of such plant when the general revenues are not chargeable therewith cannot affect the special fund doctrine.

It can therefore be said that the principle laid down in the Barnes v. Lehi Case is the settled law of this state and was so before the Granger Act was passed. Not only was it the settled law of this state but the law of an imposing array of other states. The case of *Fjeldsted* v. *Ogden City*, supra, did not repudiate the Barnes v. Lehi Case. It did not even modify it, but it held that the *conditions for the avail-*

*ability of the special fund doctrine* were not present in so far as the special fund was attempted to be constituted by revenues which were to come from an already owned municipal utility which had thitherto been part of the general revenue. Whether or not such holding was sound, a matter ably challenged in the dissenting opinion, we need not now decide because in the instant case there is no contemplated income which can be said to have formerly formed a part of the general revenues which it is intended to divert to the special fund. There are some land and some water rights to be put in by the city which will become part of the whole project, but it is not shown that these will in any way affect the general revenue used for general corporate purposes. In the instant case all the income which will constitute the special fund will be created by the improvement and none will come from an already operated and owned municipal utility. So again, we may reiterate that the principle of the Barnes v. Lehi Case—the so-called special fund doctrine—stands as the law of this state and is applicable to this case.

We must now call the reader's attention to a very important fact; that is, that all we have said about the special fund doctrine being part of the law of this state was not primarily for the purpose of so demonstrating what the law was in this regard but to show what now follows, that before the Granger Act, chapter 22, Laws of Utah 1933, Second Special Session, the special fund doctrine was in reality just one of the means of effectuating what before the Granger Act was passed and since then is part of the statutory law of this state. It was recognized by the courts as a reasonable and legitimate manner of exercising the powers given to a city by what is now designated as section 15-8-14, R. S. 1933. It reads:

"They may construct, maintain and operate waterworks, gas works, electric light works, telephone lines or street railways, or authorize the construction, maintenance and operation of the same by others, or purchase or lease such works from any person or corporation, and

they may sell and deliver the surplus product or service of any such works, not required by the city or its inhabitants, to others beyond the limits of the city."

This section is in a separate chapter and entirely independent from sections 15-7-7, 15-7-8 and 15-7-9, which cover the case of a municipality acquiring water, light and sewer systems by means of bonds, the *principal and interest of which are payable out of taxes to be levied for that purpose.* Such bond issues are governed by the constitutional provisions regarding debt limitations and the provision which requires that no expenditure for the year be made beyond the obtained or anticipated revenue for the year except by an election. Section 15-8-14, does not require a bond issue, an election, or any particular method. It gives the cities (not towns) power to construct and operate electric light works or authorize their construction, etc. There were no methods set out for the construction or for the payment of the construction. If the city had a surplus from general revenues it could construct under this provision without an election. And it could construct in any other way which comported with the practices of good business and sound economy, as long as it did not infringe on the constitutional provisions which prohibited current annual obligations and expenditures from exceeding current annual revenues and which prohibited any indebtedness above a certain fraction of the assessed valuation. There were no details or methods linked with the power. Therefore, the power to use such methods and means which were appropriate to carrying out such power was implied. In construing a certain famous document which also supposed to grant powers only expressly given or necessarily implied, Mr. Chief Justice Marshall, in *McCulloch* v. *Maryland,* 4 Wheat. 316, 421, 4 L. Ed. 579, said:

"Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional."

In the case of *Wadsworth* v. *Santaquin City*, 83 Utah 321, 28 P. 2d 161, 171, Mr. Justice Folland recognized this principle when he stated:

"Where a power is conferred on municipalities, the method of exercising such power is, in absence of restriction, usually within municipal discretion, but, where the method of its exercise is prescribed such method constitutes the measure of the power."

He mentioned four ways of paying for waterworks systems including the Granger Act, but did not exclude other methods. The question as to whether the Granger Act was the sole method of exercising the powers granted by section 15-8-14, supra, was not up for decision. In fact, the very basis for the so-called special fund doctrine lies in the fact that it provides a method for cities to acquire certain improvements which their charters or the Legislatures have permitted them to acquire, construct, and operate without running athwart of the constitutional inhibition against exceeding indebtedness, or without paying for them out of current funds, which in most cases they could not do. The very reason the courts recognize this so-called special fund doctrine was not as counsel for plaintiff would have us believe, to judicially legislate, but because it was apparent that it was a legitimate means to exercise a power given to the city where no means or method had been prescribed. The method was so natural and so sensible that in examining it usually all the courts had to do was to determine whether it violated the constitutional debt limit provisions. And, except in a few states where the constitutional provisions were of such a nature as to take in any obligation, the overwhelming number held that the word "debt" as used in the Constitution did not contemplate a contract wherein the creditor was willing to look solely to the income from the project for the payment of his loan. And well might they have taken such view of it, for if the framers of the numerous Constitutions wherein a debt limit was included had been asked, "Do you mean this provision to cover a case where a city or town

may be able to provide its inhabitants with services by the construction of projects which will not be a charge against taxes, but which may be built entirely from the proceeds of bonds which provide that their only source of payment shall be from the revenues of the project?" the answer we may well imagine would have been, "We mean these debt limiting provisions as a protection against burdening the taxpaying inhabitants with too great a load and at the same time to prevent the cities from obligating themselves for expenditures for any current year beyond the current revenue which it may reasonably be expected they will during that year obtain, but we certainly would not want to prevent the people of any city from obtaining the fruits of community life by preventing them from enjoying those services which they may obtain by voluntary payments for the services to a project built by moneys loaned by persons willing to look altogether to the income derived from such services voluntarily subscribed for by the inhabitants."

We think that to ascribe any other intent to the framers of the Constitution would do them the injustice of holding that they desired to make the Constitution a barrier rather than a highway to progress. Therefore, it is not necessary to indulge in any finespun argument as to the meaning of "debt" in all its aspects. All we need do is to see what was intended by the framers of the Constitution by including the debt limit provisions and interpret "debt" in the light of that intent.

Having, therefore, come to the inevitable conclusion that the so-called special fund doctrine is merely another recognition by the courts that where a power is given to the city and no methods of excuting it are linked therewith, any reasonable means which will effectuate the purpose is lawful, it follows that it was not a "doctrine" introduced by the courts but a means used by cities in execution of their statutory powers and recognized by the courts in the usual manner in which the legitimacy of numerous other transactions is recognized as lawful. It was not judicial legislation. Be-

ing, therefore, in pursuance of a statutory power, it must still exist as a part of the means to exercise the power given by section 15-8-14, supra, now as well as before the passage of the Granger Act. This would probably be so if the Granger Act had not expressly spoken, unless the act was expressly linked with said section 15-8-14 so as to make it the now exclusive method of using the special fund method; but the Granger Act by express words makes itself an accumulative and alternative method in addition to those already existing. It reads:

Section 2. "This act shall be construed as a cumulative statutory authority for the purposes herein named and shall not be construed to repeal any existing laws with respect thereto, it being the purpose and intent of this act to create an additional and alternate statutory method for the purposes herein named."

Here we have in express words, as plain as they may be stated in the English language, that the Granger Act shall not be construed as repealing any existing laws with respect to the purposes named in the act. The purposes named in the act were those of providing means for the purchase, construction, improvement, enlargement, extension, and repair by any county, city, or incorporated town of, among other projects named, an electric plant and/or distribution system, etc. This act gave counties and towns the right to do something they formerly did not have, and as to those the method prescribed by the act would have to be followed. But as to cities there was an existing law, section 15-8-14, supra, which was by the act not repealed. One of the methods for effectuating this power was by acquiring, as had Lehi City, by a conditional sale and payment by installments. Another way as fully within the principle laid down in the Barnes v. Lehi City Case was construction by selling special revenue bonds which were no charge against taxes. This power given by section 15-8-14 still exists and the means whereby it may function exists as fully and as effectually as if the Granger Act had not been passed. To hold otherwise would

leave section 15-8-14 on the statute books but render it ineffective. Certainly, the Granger Act, which itself said that it should not be construed to repeal any existing laws with respect to the acquisition and construction of electric power plants, did not mean to effect a virtual repeal of section 15-8-14 by taking away the only means by which it could be effectuated, to wit, resort to special revenue bonds or other means to carry out the general powers given in that section.

This thesis is fully substantiated by the circumstances under which the Granger Act was passed. Ogden City was in need of funds to repair a rapidly deteriorating water system. We said in the Fjeldsted Case that it could not pledge revenues derived from an already owned system even though those revenues had formerly been tapped to relieve the general taxpayer instead of being returned to the system to make the very repairs which Ogden City was then, because of such divertion, compelled to borrow money for. Only revenues from the new part could be pledged for payment of the new part. As Mr. Justice Straup remarked in his dissenting opinion, the Granger Act was "a legislative struggle" to devise some means whereby the special fund doctrine, notwithstanding the Ogden decision, might be made applicable and operative under the circumstances and conditions involved in that case. As far as the special fund doctrine applied to cities in those cases where the cities already had power to construct and operate utilities, that was its purpose. It did not and it expressly said it did not intend to disturb any existing laws with respect thereto. The cumulative statutory authority was as to powers given to purchase, construct, etc., certain projects in regard to which power did not thitherto exist and to provide a method of applying the special fund doctrine to a situation as existed in the Ogden Case.

The very title of the Granger Act reveals that it was for the purpose of "Affording a Means of Obtaining Assistance From the Federal Emergency Administration of Public Works in Carrying Out of Such Projects." Section 22 of the

act reads in part as follows: "It being deemed by reason of the existing *state of the laws* of the state of Utah that counties, cities and incorporated towns in Utah are not able to obtain loans from the Federal Emergency Administration of Public Works for the purpose of purchase, construction, improvement, enlargement, extension or repair of such projects or services as are named and referred to in Section 1 of this Act, the legislature deems that an emergency exists."

It permitted for that purpose the construction or acquisition by cities of many enterprises which theretofore these towns and counties had not been permitted to operate, such as slaughterhouses, ice plants, hospitals, and included among them waterworks, gas and electric light works which under other statutory provisions, which the act by express terms stated should remain in force, the city could construct and acquire. The act also gave to counties and incorporated towns the right to acquire or construct with federal aid all these enterprises, including electric light plants, which counties at least were not theretofore permitted to acquire or construct. It is clear that the Granger Act was to permit the construction of any of these projects from funds to be furnished by the federal government and was designed to meet the requirements of the federal government as a condition of furnishing or lending the money. Section 14 of the act was designed to endeavor to comply with the restrictions laid down in the Fjeldsted Case. It did not affect the power to proceed under section 15-8-14, R. S. 1933, where no federal funds are involved. Section 22 of the act shows that it was deemed that the existing laws of the state did not permit counties, cities, and incorporated towns to obtain loans from the Federal Emergency Administration of Public Works for the purpose of purchase, construction, etc. This act was to provide machinery whereby they could take advantage of the federal act and regulations and did not affect methods theretofore used wherein it was not desired to obtain federal funds.

It is also persuasive of this conclusion that the Granger Act is for an emergency only. By its own section 23, as amended by chapter 74, Laws of Utah 1935, it provided that the act should cease to be in effect except to complete projects theretofore entered into at such time as the Governor shall by proclamation or the Legislature by joint resolution declare the emergency recognized by section 1, chapter 21, Laws of Utah 1933, Second Special Session, has ended. Is it likely that the Legislature would have repealed by implication section 15-8-14 by an act which itself would be eliminated as soon as the emergency had passed? If before the Granger Act went into effect section 15-8-14 was in effect was it altogether repealed or suspended by the Granger Act—a temporary measure? When we take in the numerous sorts of projects which towns, cities, and counties were permitted to undertake by this Granger Act, together with this provision for termination, it is clear that it was for the purpose of permitting these cities, towns, and counties to take advantage of the provisions of the National Recovery Act, 48 Stat. 195, and that it did not want to affect projects like this endeavored to be undertaken by Provo City which do not depend on the National Recovery Act, but are independent of it.

In consequence of what has been said heretofore, we think it plain that the fallacy of plaintiff's contention lies in construing the Granger Act, as providing the only method now extant for applying the special fund doctrine to the acquisition or construction of electric light plants by cities. In making the above analysis we have not considered matters which lie outside of the scope of our province which seem to be injected into the case by plaintiff under the argument of public policy. It is not our business to determine whether or not it is a good thing for Provo City to undertake this project or, on the other hand, whether it will adversely affect the interests of plaintiff. It may or may not be that in this day of interstate integrated power systems the time for creating municipal fragments of such systems is an eco-

nomic step back, and that if we have public ownership it should be of these integrated systems by federal authorities, or it may or may not be an advantage to the inhabitants of Provo City. Those matters are for the legislative action of the people or the board of commissioners of Provo City. They are matters which go to the wisdom and not the law of the situation.

And in this regard we consider the fifth point made by petitioner; that the Legislature has affirmatively declared the public policy in reference to public utilities: It may be that by subtracting the bulk of the urban business, leaving it to depend largely on the rural and mining business, a greatly needed public utility cannot exist, and that with the Public Service Commission determining proper values on which to base fair rates, as a matter of public policy this organization should be alone permitted to occupy the entire field. But until the Legislature thus speaks, we cannot, in the face of specific legislative authorization to the cities permitting the acquisition and construction of plants, hold what petitioner contends for is the public policy of the state.

Furthermore, we think the case should be considered free from predilections for or against municipal ownership and as if the power company were not a competitor in the field. Provo City, having given the franchise, may, if within its legal rights, act for itself so as to affect the value of the franchise it has granted. When it comes to measure the powers of a city in this regard, we prefer to think of a town, rapidly growing because of some new and permanent industry, which badly needs a water system large enough to take care of its future needs, but which it cannot purchase within its debt limit or out of current funds. In such a case, it seems to us we free ourselves from all unconscious factors which may enter where a company already in the field may suffer loss from the building of a municipal plant. In such case we have the bare question of a city's power without the factor of the interests of a competitor entering. In such case might we not all be slow to say that, if an investor were

to offer to advance the funds to construct the water plant so necessary for that town and look only to the revenues obtained from the inhabitants of the town for repayment with faith in its growth, the town could not take advantage of such offer? That is the special fund doctrine. In testing the powers of Provo to do what it desires under the two ordinances which it has passed, we can place it in the position of the supposed rapidly growing but financially limited city which badly needs a water system.

Mr. Justice LARSON has supplied a very interesting thesis in support of the proposition that when the people of a city act in those matters of government affecting their local community under the initiative law, their action arises from power to so act reserved in the Constitution; that their action in reference to those matters which affect only their governmental unit is just as efficacious in that field as is the action of all the people of the state in the matter of legislation in the field in which they act. The writer does not understand his thesis to encompass the proposition that the people of a municipality can invest their municipality with powers not given by the Constitution or the Legislature, but that it can exercise those powers already invested in it; that the Constitution and the statutes have already invested the municipality with the power to acquire or construct an electric light plant and system and that as to this power the people can by initiative exercise it according to such plan or with such conditions attached as they may see fit to supply, provided those conditions are within the power or reasonably appropriate to its execution; that the provisions of the Granger Act apply as a limitation only to the action of the governing body of the municipality, that is, the commission or council, and not to the people of the municipality if they initiate and pass the ordinance. It with the last proposition that the writer has difficulty. The writer conceives of the legislative or governing body of a municipality as exercising *all* the powers of the municipality; that the people may do no more.

If there are limitations on the power of the representatives, those limitations also apply to the people in the exercise of the power. In this case the provisions of the Granger Act were not a limitation on the commission of Provo City acting under section 15-8-14, R. S. 1933. By the same token they were not a limitation on the people acting under section 15-8-14. The difference between Mr. Justice LARSON and the writer is that the former thinks the Granger Act supplied limitations on the legislators of the city (the commissioners) acting, but not on the people of the city, whereas the writer thinks that such act supplied no restrictions on either legislating power acting under the authority of section 15-8-14, R. S. 1933. But while Mr. Justice LARSON and the writer come to the conclusion that the Granger Act did not apply for different reasons, both come to that conclusion and both, therefore, think that the plaintiff's argument that the Granger Act must be followed must fail.

The writer agrees with the conclusions reached by Mr. Justice LARSON in regard to his construction of the Nuveen contract. As heretofore stated, the contract must not be construed to mean that more than a reasonable rate for services can be charged by the city plant to the city for power. We see no reason at this time for laying down any criteria for arriving at what is a reasonable rate. It is not necessary to supply a test at this time. "What the service is reasonably worth," may be another way of stating "reasonable rates," but what elements are to be taken into consideration in arriving at a reasonable rate require exploration in a field not now necessary to enter.

The writer also agrees with the analysis and conclusions in regard to the construction of the Ulen contract; also with the conclusion that a bond for the faithful performance of that contract must be given; also regarding the conclusions reached as to intervener's contentions respecting the validity of the two ordinances, including what has been said respecting the duty to call for bids.

Since the writer believes that the governing authority had the same right to pass this ordinance subject to reference to the people as the people had to initiate it, it may not be necessary to determine how far the people could go in including detail in the initiated ordinance, nor necessary to attempt to draw the line between executive and legislative functions of the governing body; nor to determine to what extent the governing body (commissioners) could overrule, alter, or repeal the legislative part of an ordinance voted on by the people; nor perhaps to determine how far such governing body could change or repeal so-called executive or administrative detail which accompanied the legislative matter passed on by the people. This would take us into a large field. It might be impossible to lay down a rule whereby legislative and administrative matters could be separated in advance, each case depending on its own facts. Roughly, it is true that in the matter of acquiring or constructing a power plant, the legislative or lawmaking function would go at least to the extent of a decision to (1) acquire or construct, (2) the size of the plant as regards capacity, (3) the type of plant, (4) the maximum cost of the plant. Perhaps all other matters may be executive or administrative, such as the make of generators, the material of which the plant is to be constructed, whether brick, stone, or concrete, and the other multitude of minutiae attendant on the building of such a plant.

The writer thinks that the governing body had the right in this case to exercise the legislative and administrative functions under section 15-8-14, R. S. 1933; that it could have initiated and passed the two ordinances itself subject to the right of referendum; that it could have passed them when initiated by petitions and not voluntarily referred them; that in this case under section 25-10-25, R. S. 1933, it chose voluntarily to refer the ordinances it passed to the people for voting. Whether, therefore, these ordinances came by force of the commission's action or by force of the people's vote is not necessary to decide. If the commission

had passed the ordinances and rested and the plaintiff had referred them to the people with like result, as in this election, it would seem that the election would be only an approval of the commission's action and that the ordinances would derive their legislative force from the commission's and not the people's action. Is it otherwise when the commission passes the ordinances and voluntarily refers them to the people for approval? Or is it as if the ordinances had been initiated by petition, rejected by the commission and put to the people and favorably voted on, in which case the ordinances would derive their legislative force from the people's vote? The writer does not here attempt a solution of these questions. Believing as we do that the commission had the power, independently of the Granger Act, to pass these ordinances without reference to the people, the questions which might finally confront us would be as to the extent of change which the commission could make in the legislative or administrative features *after* the people had actually voted on definite legislative and/or administrative features. Inasmuch as the governing body has not attempted to alter or make any changes inconsistent with the matters voted on by the people, there is no occasion at this time to distinguish between legislative and administrative features of the ordinances, nor to determine whether one or both types of matters passed upon can be altered, repealed, or added to in such wise as to cause an inconsistency. And there is no occasion to determine whether, after approval, Nuveen & Co. or the Ulen Corporation could compel the governing body to execute the contracts exactly as set out in the ordinance or whether the latter could still require certain changes or additions. Under the theory of the writer to the effect that the power to make these contracts resided with the governing body, since the state of negotiations is still in the realm of proposals, such changes could be made unless, indeed, no changes in regard to legislative matters or administrative details can be made after the approval of the people of particular ordinances even if we conceive

of such ordinances obtaining their force from action of the governing body. That question, as said before, does not now confront us. According to the implications of the opinion of Mr. Justice LARSON, the field is left open, at least in respect to the executive and administrative functions, to make the additions and changes in the final contracts with Nuveen & Co. and the Ulen Contracting Corporation as suggested by his opinion. We have no doubt but that those changes and additions, calling for deposit of the money derived from the sale of bonds and for the bond for faithful performance, may be made, although we think it unnecessary to definitely decide in regard thereto, because we are not confronted with a situation where the city refuses to make the changes or the two companies insist on the contracts being executed without the changes or additions.

It being the opinion of three members of this court that the two ordinances—the so-called bond and construction ordinances—were and are valid, and it being presumed that the city commission of Provo City will execute the authority given under said ordinances in a lawful manner, the temporary writ of prohibition heretofore issued is recalled and a permanent writ denied. Costs are awarded to defendants against plaintiff and intervener, the costs against the intervener to be limited to such as were incurred by reason of its intervention.

HANSON, J., concurs.

LARSON, Justice.

The so-called special fund doctrine, or the holding that a liability or obligation of a public body incurred in the construction or extension of a public utility, where the liability or obligation is payable solely out of the revenues derived from such utility or such extension, is not a debt within the inhibition or prohibition of the State Constitution, fixing debt limits for such public body, is too well established in our jurisprudence to be disturbed at this time. The doctrine is now recognized and established in some thirty-two states

and the number is steadily growing. I shall therefore recognize the special fund doctrine as established law in this state and devote no time to a consideration of its merits or weaknesses, but enter at once into a consideration of the two questions upon which this action hinges: (1) Did the Granger Act pre-empt the field with reference to issuing revenue bonds, that is, does the Granger Act, chapter 22, Laws of Utah 1933, 2d Sp. Sess., provide the sole and exclusive method by which revenue bonds may be issued? (2) If the Granger Act is not exclusive, are the ordinances involved in this action and the methods by which Provo City is proceeding valid and proper?

To my mind the solution of this matter does not depend on whether the Granger Act pre-empted the field with reference to issuing revenue bonds, as held by Mr. Justice MOFFAT, or whether the Granger Act was just an additional statutory remedy leaving the procedure used in the Barnes v. Lehi Case as modified by the Fjeldsted Case still open to the municipalities, as held by Mr. Justice WOLFE. The city proceeded in this case under the initiative provisions of the State Constitution and statute enacted pursuant thereto. The constitutional provisions pertinent to this inquiry provide:

Preamble, "we, the people of Utah, in order to secure and perpetuate the principles of free government, do ordain and establish this Constitution."

Article 1, § 2, "All political power is inherent in the people; and all free governments are founded on their authority for their equal protection and benefit."

Article 1, § 24, "All laws of a general nature shall have uniform operation."

Article 1, § 26, "The provisions of this Constitution are mandatory and prohibitory, unless by express words they are declared to be otherwise."

Article 1, § 27, "Frequent recurrence to fundamental principles is essential to the security of individual rights and the perpetuity of free government."

Article 1, § 25, "This enumeration of rights [in this constitution] shall not be construed to impair or deny others retained by the people."

In these sections is laid down the basic fundamental philosophy underlying our Constitution and government setup, and a proper appreciation thereof is necessary to an understanding and interpretation of them.

The form of the state government is set up in articles 5, 6, 7, and 8 of the State Constitution and the powers divided into three distinct departments, the legislative, the executive, and the judicial. The duties, limitations, and powers of each department are set forth and within the sphere allotted to each of them in the exercise of their proper power, the executive and the judicial departments are absolute with undivided authority. The legislative department, operating in the broader field of determining policy and enacting the laws which affect our lives, liberties and property, is subjected to a divided authority and to checks from the other departments. To prevent the Legislature in such field from infringing the inalienable rights declared in article 1, section 1, of the Constitution, and lest they may forget section 27 with respect to recurrence to fundamental principles, the legislative department of the state was placed in a divided responsibility. Article 6 of the Constitution vests the legislative power of the state in two separate bodies: (1) In a Senate and a House of Representatives designated as the Legislature. (2) In the people of the state of Utah through the initiative and referendum. These two legislative bodies are separate and distinct. For economy and convenience the routine of legislation is exercised by the Legislature, but the legislative power of the people directly through the ballot is superior to that of the representative body. By the referendum the people may repeal an act of the Legislature, may prevent it from taking effect, and may suspend its operation until they may express themselves thereon by ballot. Bear in mind that the Constitution vests the Governor with veto power on acts of the Legislature, but he has no veto power on legislation enacted by the people through the initiative. And if an act enacted by the Legislature and one enacted by

the people through the initiative conflict, the enactment by the people controls over the act of the Legislature.

Article 6 provides further that the initiative and referendum may be exercised by fractional parts of the state, by legal subdivisions thereof, and by municipalities, and declares that the people of the state, or any fractional part, or legal subdivision thereof, may, as provided by law, enact by initiative *any desired legislation* within the field in which such subdivision or fractional part may function in a governmental way. Chapter 10, title 25, R. S. Utah 1933, sets up the methods or machinery for carrying into effect the provisions of article 6 of the Constitution, and, in section 21 et seq., declares that legal voters of any city or town may initiate any desired legislation in the same way and to the same extent within the city and its powers as the people of the state may do within the state as a whole. And this was the method followed by Provo in enacting the two ordinances under attack in this action.

The Constitution provides two methods by which municipal corporations may be established and set up: (1) Pursuant to general laws enacted by the legislative authority of the state for the incorporation and establishment of cities and towns. (2) By framing its own charter by initiative proceedings. Article 11, § 5. Since it is admitted that Provo falls in the first class, we need not discuss the distinctions between them in detail. The City of Provo not having a charter under the special provisions of article 11, § 5, is a creature of the Legislature and as such has the powers granted to it which the Legislature has granted to all cities of its class by general law. *Salt Lake City* v. *Sutter,* 61 Utah 533, 216 P. 234. Such grants of powers to the city form, in effect, the Constitution for the city. They define the things it may do, the extent of its political powers, and the governmental functions it may exercise. Within that sphere the city may act, may proceed, and may determine its policies and carry them into effect, and within such grant the city

acts within its constitutional powers. The powers conferred upon cities by the Constitution are set forth in section 5, article 11, as follows:

"The power to be conferred upon the cities by this section shall in-clude the following:

"(a) To levy, assess and collect taxes and borrow money, within the limits prescribed by general law, and to levy and collect special assessments for benefits conferred.

"(b) To furnish all local public services, to purchase, hire, con-struct, own, maintain or operate, or lease, public utilities local in extent and use; to acquire by condemnation, or otherwise, within or without the corporate limits, property necessary for any such pur-poses, subject to restrictions imposed by general law for the protection of other communities; and to grant local public utility franchises and within its powers regulate the exercise thereof.

"(c) To make local public improvements and to acquire by condem-nation, or otherwise, property within its corporate limits necessary for such improvements; and also to acquire an excess over than [that] needed for any such improvement and to sell or lease such excess property with restrictions, in order to protect and preserve the im-provement.

"(d) To issue and sell bonds on the security of any such excess property, or of any public utility owned by the city, or of the revenues thereof, or both, including in the case of public utility, a franchise stating the terms upon which, in case of foreclosure, the purchaser may operate such utility."

This provision expressly grants to the city the right to acquire, own, construct, and operate electric light plants and distribution systems and also the right to issue bonds on the revenues of municipally owned utilities. The power to ac-quire, construct, own, and operate electric lighting plants and distribution systems had been granted to cities by legis-lative act prior to the amendment to the Constitution grant-ing the power. The constitutional grant was to forever pro-hibit the Legislature from repealing its grant of power and so deny such right to the municipality.

Pursuant to constitutional provisions, the Legislature has provided a form of government for cities and towns. Provo has a commission form of government as provided by law.

Within the field or scope of the organic act, as it were, of the city—the powers granted by the Constitution and Legislature—the city commission acts as one part of the legislative body of the city, and the city commissioners as the executive department of the city. In cities without the commission form of government the mayor heads the executive department and the city council is one part of the legislative body. As above indicated the people of the city constitute another legislative body of somewhat superior powers. Both, however, must operate within what might be called the organic act of the city—the grant of powers to it.

The Legislature may regulate the term of office and compensation of officers of cities incorporated under general acts of the Legislature. Such offices being creations of the Legislature may be controlled by it. The Legislature may define their duties and prescribe the methods by which such duties may be exercised or discharged. It may exercise over its officers an administrative control and lay down the procedure by which they are to be governed. In doing so the Legislature is not infringing, limiting, or regulating the powers granted to the municipality. It is not exercising municipal functions, nor controlling the same. It is merely setting forth administrative details to govern the offices it has created and it has wisely provided that, when it has not prescribed the administrative method to be pursued by city officers, such officers shall themselves determine the method by ordinance. Section 15-7-2, R. S. 1933.

Statutes prescribing how the city may proceed in exercising any of the powers granted to it in purely local matters, that is, in matters not of state interest, are administrative details only and are not to be construed as limitations or as grants by the Legislature. They are not limitations upon the powers of the city but are directory to the city officials; they do not provide that the power is granted to the city only when exercised in this way but provide that the city officials when exercising the function shall proceed as therein di-

rected. It is not that the Legislature seeks to guard the city against availing itself of the power granted, but to protect the city against erroneous, careless, hasty, or fraudulent actions by the officers in its exercise. "That the City Commission or the City Council must proceed in this manner when it assumes to act for the city in this matter," is all the Legislature has said in administrative enactments.

An examination of the statutes makes this plain. Title 15, R. S. 1933, contains the legislative pronouncements governing cities and towns. The first 6 chapters set up the system of city and town government, and then chapter 7 has to do with powers of cities and towns. Section 15-7-2 reads:

"When by this title power is conferred upon the board of commissioners, city council or board of trustees to do and perform any act or thing and the manner of exercising the same is not specifically pointed out, the board of commissioners, city council or board of trustees may provide by ordinance the manner and details necessary for the full exercise of such powers."

Section 15-7-7 authorizes cities to issue bonds for water, light, and sewers, and provides that the city commission or council cannot do so except by vote of the people.

Section 15-7-15 declares that municipal power plants cannot be sold except on vote of the people, and section 15-7-17 then provides the council or commissioners cannot sell even after an authorizing vote unless the bid equals the price fixed by a committee of citizens from outside the council or commission. Section 15-7-18 declares that money received from sale of such plant in excess of debts against the plant is a special fund and can only be expended by the city after an election wherein the people vote authority to extend it. Section 15-7-19 authorizes cities to grant city lands to railroads but only after it has been submitted to the vote of the people.

The foregoing provisions, sections 15-7-1 to 15-7-19, covering all provisions of the statutes relative to the city entering or quitting the field of major activities affecting the

whole community, serve as distinct limitations and restrictions on the activities of city officials, not cities, and provide that the officials may act only after a vote of authority by the people. This is in keeping with the constitutional provisions, supra, that frequent recurrence to fundamental principles is necessary in understanding our government and its powers and Constitution. Foremost among those fundamental principles is that provision of the Constitution that all political power is inherent in the people and they may do anything in the expression of their popular will not expressly prohibited by the Constitution and they may even change that. Be it noted that none of the sections above, except the constitutional limitation on debt, is a limitation on the city, but on the city officials, and refers them for authority to the source of all power, the people.

Sections 15-7-20 to 15-7-63 have to do with special improvement taxes and districts and provides that such cannot be done without the approval, express or implied, of the people affected thereby within the district. Still carrying on the fundamental principle that the limitation fixed and methods prescribed by the Legislature are not against the city but the city officers, chapter 8 of title 15, being sections 15-8-1 to 15-8-108 having to do with general powers and duties of all cities, prescribes no methods for carrying out the provisions, and vests the authority to do so in the city council or city commission. These chapters cover not matters of civic policy or matters of great moment, or things necessarily of long duration, but matters of detail administration within that group of activities generally called police powers pertaining to public health and safety. As to those matters the city council or city commission may by ordinance provide for the exercise of the power and the manner and method in which it shall be exercised. Sections 15-7-2 and 15-8-84. This covers all statutes as to cities except the Granger Act.

The Legislature has therefore done the following with respect to cities: (1) Provided for their incorporation,

classification, and form of government. (2) Granted to them certain powers. (3) Provided that, within those matters of governmental functions commonly spoken of as police powers, the city commission or city council may by ordinance prescribe the manner and extent of administration. (4) Provided that within the broader field of powers granted cities, or longer range planning, and determination of policy not reasonably changeable from day to day, the city officials can act only after and in accordance with authority received by a vote of the people granting the same. We repeat, all statutory inhibitions upon the exercise of municipal powers are not against the city, but are upon its officers if they act without consent of the electorate. We have referred to these matters to show that the Legislature itself *in recurrence to fundamental principles* has recognized that within the scope of municipal powers there is no limitation upon the voice of the people sounded through the ballot box; *that all political power is inherent in the people* and within their own constitutional bailiwick they determine public and legislative policy.

Let us look briefly at the Granger Act, chapter 22, Laws Utah 1933, 2d Sp. Sess., and see how it fits into this scheme of things. It provides that any county, city, or incorporated town in the state may purchase or construct, inter alia, electric plants and distribution systems and extensions thereof or additions thereto. Amendment of 1935, chapter 74. This is a grant or reaffirmation of a grant of power to the cities. Section 2 declares that the act "shall be construed as a *cumulative statutory authority* for the purposes herein named and shall not be construed to repeal any existing laws with respect thereto, it being the purpose and intent of this act to create an *additional and alternate statutory method* for the purposes herein named." Section 3 provides:

"*Whenever the governing body of any* * * * *city* * * * shall determine to proceed under this act * * * *it shall first cause* a comprehensive estimate to be made, * * * [*second*] *shall, by ordinance*

* * * *by at least two-thirds vote* of the governing body, provide for the issuance of revenue bonds." etc.

It is evident therefore that the Legislature was merely putting limitations on and prescribing the method by which the governing body of the city could proceed to do these things without first taking a vote of the people, the source of power.

It is nowhere declared that before a city can do the things therein provided the requirements of section 3 must be complied with. What it does declare is that before the governing body can issue revenue bonds [without a vote of the people] they must meet requirements 1 and 2 of section 3 of the act. It is another evidence that the Legislature in keeping with the spirit of article 1 of the Constitution has not assumed to prescribe the method in which the people, the source of all power, and who by the Constitution retained unto themselves the right to exercise all political power, even to the extent of changing their government, and specifically declared that by the initiative process the people themselves were a legislative body coequal in power and with superior advantages to the Legislature, must exercise their power. This power is also perpetuated to the people, unlimited, in each subdivision or fractional part of the state, within the scope and extent of its granted and governmental powers. The Constitution grants it and the Legislature, as shown above, has nowhere indicated any intent or attempt to limit or circumscribe it. The Granger Act therefore, confirms what was said earlier in this opinion that the limitations written and methods prescribed by the Legislature are limitations and restrictions, not upon cities, but upon the city officials when they act upon major matters without a vote of the people, for the purpose of protecting the community, the people, from hasty, ill-conceived, fraudulent, or questionable ventures of officials serving short terms and who may wish to put over some pet scheme or "child" of their

own. On important matters the people must not be left unadvised or their will ignored.

It would seem, therefore, that city councils or city commissions holding offices created by the Legislature are, in the discharge of those duties, subject to such rules as may be prescribed by the Legislature. And when they seek to issue revenue bonds without the consent of the people they are subject to the control of the Legislature and must proceed in the manner prescribed in the Granger Act. But the people themselves are not creatures or creations of the Legislature. They are the father of the Legislature, its creator, and in the act creating the Legislature the people provided that its voice should never silence or control the voice of the people in whom is inherent all political power; and being coequal in legislative power, the Legislature, the child of the people, cannot limit or control its parent, its creator, the source of all power. And when the people, by the proper exercise of the initiative, their method of legislating, have spoken on a matter essentially within their scope of government, the master has spoken and even the voice of the child, though it may be recalcitrant, is stilled. This I conceive to be the spirit of the Constitution of the state and of the federal government; this is the meaning of article 1 of the State Constitution which declared all political power to be inherent in the people, and in adjuring all people and all state departments and officers to frequently recur in their deliberations to fundamental principles, which adjuration is directed to the judicial department as well as the legislative and executive departments.

This principle of interpretation has been applied by courts of other states. The Supreme Court of Oregon in *Schubel* v. *Olcott*, 60 Or. 503, 120 P. 375, 379, says:

"The principle of local self-government is regarded as fundamental in American political institutions. It is not an American invention, but is traditional in England, and is justly regarded as one of the most valuable safeguards against tyranny and oppression. From Blackstone and the elementary writers we learn that the civil divi-

sions of England—counties, towns, etc.—date back to the times of Alfred the Great. In no changes of policy, dynasty, peace or internal war, or even conquest, have these organizations been abandoned. They are in effect the same now as they were before the Norman Invasion. Wherever the Anglo-Saxons have gone with their language and laws, these communities, each with a local administration, have gone with them. Here have been the seats of modern civilization, the nurseries of public spirit, and the centers of constitutional liberty. They are the opposites of those systems that collect all power at a common center. This right of self-government should be carefully guarded and every infraction or evasion thereof condemned. This important principle finds its ideal counterpart in the New England town meeting, which is a legal assembly composed of the qualified voters of a town, and held for the election of all town officers and the discussion of all matters pertaining to the public business, property, and expenses of the town. Black's Constitutional Law (3d Ed.) 504, 505.

"In pursuance of this general principle, municipal corporations are established in all the states and invested with rights and powers of government subordinate to the general authority of the state, but exclusive within their sphere. The principle of local government being thus firmly implanted in our political system, it rests with the legislative authority of each state, which, in this state, includes the legal voters by means of the initiative, to apply and adjust this principle to the varying needs of its own people. That sovereign authority must determine what municipal corporations shall be created and what shall be their powers and the limit of their jurisdiction, according to the requirements of the different sections and districts of the state and their capacity and need of local government. In some of the states, the right of local government is guarded by constitutional provisions forbidding the Legislature to make any private or special laws 'regulating the internal affairs of towns and counties.' In others, it is considered as one of the rights inherent in the people at the time of the adoption of the Constitution and reserved to the people by that instrument, except as modified by the grant of authority to the Legislature. Black's Constitutional Law, § 185.

"In this state we have a dual system of legislation. By the provisions of our constitutional amendments, the right to enact local, special, and municipal measures is reserved to the legal voters of their municipalities and districts. This authority is to be exercised in the respective localities by means of the initiative process. Whatever have been the duties or powers of counties prior to the adoption of these amendments, we see no reason why such quasi municipalities or

districts cannot be endowed with legislative functions by the plain provisions of the Constitution."

And in *Allen* v. *State,* 14 Ariz. 458, 130 P. 1114, 1117, 44 L. R. A., N. S., 468, the court intimates that the action of the people under an initiative is to be given greater weight than an act of the Legislature, saying:

"All political power is inherent in the people, and governments derive their just powers from the consent of the governed. This is not a mere metaphor, that sounds pleasing to the ear, nor is it a maxim that may not have a concrete application; but it is a vital principle, adhered to in the formation of the government of this state. By their Constitution, the legislative authority was vested in a Legislature, consisting of a Senate and House of Representatives; but the people reserved the power to propose laws and amendments to the Constitution, and to enact or reject such laws and amendments at the polls, independently of the Legislature, and they also reserved, for use at their own option, the power to approve or reject at the polls any act, section, or part of any act of the Legislature. The people did not commit to the Legislature the whole lawmaking power of the state, but they especially reserved in themselves the power to initiate and defeat legislation by their votes. In this state the Legislature and the people constitute the lawmaking power. This is important when we come to consider the adjudicated cases holding that if the enrollment or original record of the statute is regular on its face—that is, if the act is framed with no infirmity on its face, is duly promulgated, or properly authenticated and deposited in the proper office—it is conclusively presumed to have been regularly enacted, the record is invulnerable to attack, and proves itself. If such sanctity and verity may be given to the acts of the delegated representatives of the people in legislative body assembled, it must with clearer reason and with greater force be given to the act of the sovereign itself, the source of all governmental power, the record of which, in its lawmaking capacity, is authenticated and promulgated as the Constitution provides."

In *Long* v. *Portland,* 53 Or. 92, 98 P. 149, 1111, the court said:

"The power of the referendum is fully reserved to the people, and is not dependent upon anything, except a provision by general law as to the manner of its exercise."

Provo City having therefore proceeded by initiative to enact the ordinance in question, and the provisions of the ordinance being within the scope of power which a city may exercise, they need not comply with the statutory details as to how city officers, acting without direct authority in the matter, must proceed. The people, the source of all power, having enacted this ordinance directly as authorized by the Constitution, its validity cannot be assailed except upon constitutional grounds as to the power of the city to operate in the field covered by it. The issues as to the bond ordinance must therefore be settled in favor of the city.

Another point in this controversy should receive attention. It is contended that the city obligates itself, under the contracts, to levy and collect rates for power sufficient to pay the interest on the bonds, and the bonds themselves as they mature; that if the revenues are not sufficient for that purpose the city must pay the difference, either directly from its general fund which is tax revenues, or by charging itself higher rates for street lights and other city purposes, and thus indirectly pay the obligation from tax revenues. This argument is based upon one paragraph of section 6 and subdivisions (a) and (g) of section 10 of the ordinance of the Nuveen contract for the issuance and repayment of the revenue bonds. Those parts of the contract, as far as pertinent to this question, are as follows:

"The city has covenanted and agreed and does hereby covenant and agree that *it will fix such rates for the sale of electricity* and will collect and account for the revenues to be received for the sale of such electricity *that the net revenues so received will be sufficient promptly to pay* the principal of and interest on this bond and the issue of which it forms a part as each becomes due."

"(a) That while the bonds authorized herein or any of them remain outstanding and unpaid, the rates for all electricity sold by the said electric light and power plant and system to said city and to its citizens, and to all consumers within or without the boundaries of said city, *shall be reasonable and just,* taking into account and consideration the cost and value of said plant and system and the cost of maintaining and operating said plant and system, and the proper and necessary allowances for the depreciation thereof and the amounts

necessary for the retirement of all bonds, and the accruing interest on all such bonds as may be issued hereunder, *and there shall be charged against all purchasers of said electricity, including said city, such rates and amounts as shall be adequate to meet the requirements of this and the preceding sections hereof,* all of which revenues, including those received from the city, shall be subject to distribution to the payment of the cost of operating and maintaining the plant and system, and the payment of principal of and interest on the bonds herein authorized as hereinbefore provided;" (Italics supplied.)

(g) That in the event of default on the part of the city in paying principal of or interest on said revenue bonds promptly as each falls due, or in the keeping of any covenant herein contained, and if such default shall continue for a period of sixty (60) days, the city will appoint a manager for said system, which manager shall *have full control over* said system and shall operate said system for the City of Provo City, *and shall enforce such reasonable rates and charges as will be sufficient to make the payments required by this ordinance,* and shall in all things so operate said system as to fully comply with all of the requirements and provisions of this ordinance. The right of the holder or holders of the bonds' herein authorized to require the appointment of such manager shall not be exclusive, and in the event of default as herein outlined, such holder or holders shall have the right to proceed in law or equity to require the performance of the covenants herein contained in any action which to them shall seem appropriate." (Italics supplied.)

The sections quoted lend some color to the argument and therefore in the interests of the city, of Nuveen, and of the people who may ultimately own the bonds, if issued, we deem it necessary and proper to give attention to the question in this opinion.

These bonds, being by their terms and by the ordinance authorizing their issuance, strictly revenue bonds, to be paid only from the revenues received from the sale of electrical power from the plant to be erected, may not, directly or indirectly, be a charge on, or paid from revenues derived from, taxation. This is the gist, the crux, and the basis of the special fund doctrine. Any other construction would make them a "debt" within the constitutional inhibition, and void the whole issue. And since the city is, by the Constitution, prohibited from incurring debts beyond the specified

limit, they cannot by subterfuge or indirection do that which they could not do openly and directly. The debt inhibition was written into the Constitution to protect the citizens from, and assure them that there would be no, excessive tax burden imposed upon them. This because the duty of, and necessity for, payment of a tax is not optional or contractual, but a burden imposed not with the consent, but often against the will, of the taxpayer. There is the further reason that a tax becomes a lien upon the property of the taxpayer and may be a means of divesting him of his property. By its express terms the· Constitution makes the limitations and inhibitions on the taxing power mandatory and prohibitory. Article 1, § 26. If these provisions of the ordinance quoted above were construed to mean that the city must, or the manager of the plant ·could, fix rates for power either on the citizens or on the city for power used by it, on a basis that must produce sufficient revenue to pay the interest and the bonds as they mature, regardless of the amount of power used or consumed, the city would be made a guarantor of the bonds, and not merely a guarantor of good faith in operating the plant. For the city to be a guarantor of the bonds, regardless of revenues received, would make the obligation a debt within the meaning of the Constitution. It is the fact that the bonds are *only payable* from the revenues of the utility, and *cannot, in any event,* be paid from tax revenues, that takes them out of the debt limitation and upholds the special fund doctrine. Of course the city, in the discharge of its duties, needs electric power for its public buildings, the proper working of its electrical machinery, for lighting its streets, and other proper municipal purposes. Its officials owe a duty to its citizens to provide such lights and facilities when they can be furnished at reasonable rates. And in the exercise of a common business economy, the city may, and probably should, buy its power from its own plant when it has electrical power to sell. And the city, in the use of such power and energy may, and properly should, pay therefore a reasonable rate so that the private users of municipal

power would not be required to pay by increased rates for power furnished for public use, and used and enjoyed equally with them, by other citizens and residents not using power from the municipal plant.

And in the establishment and operation of a municipal electric power plant and distribution system, as in all of its functions and activities, the city owes to its inhabitants, and property owners within the city, the duty of safeguarding their interests, their lives, and property. The city owes to itself and its people, in its activities, the utmost good faith, and the assurance that the inhabitants and taxpayers shall receive, for every dollar of their tax money paid, a fair value and return. This right, this duty, the city has no power to waive, surrender, or contract away, and any agreement, contract, or ordinance by which the city seeks to waive, surrender, or contract away such right, duty, or obligation to its citizens is, to such extent, null and void and of no force or effect whatsoever.

The ordinance in question, and the bonds, if any, issued thereunder, are therefore, and must be, interpreted and construed in the light of the law as just stated. The provisions quoted above, therefore, mean that the city in fixing the rates to be paid by itself and other users of power from its plant, must exercise good faith with the bondholders, and levy and charge rates sufficient to pay the interest and the bonds as they mature, *provided that such rates to the city and to its inhabitants using power from the municipal plant must be reasonable rates for the type, kind, and character of the service rendered.* And in determining what rate is reasonable, the test shall not be the amount of money required to pay the bond, but what the service rendered is reasonably worth. Any attempt of the city to fix or charge rates, or for the city to pay rates, fixed on a basis that brings a rate appreciably higher than this, would be an attempt of the city to pay the obligations out of funds other than the revenues from the utility and would be unlawful, null, and void. Any construction or interpretation of this agreement,

as evidenced by the ordinance and the bonds, to render the city liable to pay rates in excess of the reasonable and fair value of the light and power it receives, would take the same out of the special fund doctrine, and would make the obligations a debt of the city in violation of the provisions of the State Constitution.

We come now to a consideration of the other ordinance, or what is referred to as the construction or Ulen contract for the erection of the proposed power plant and the construction of the distribution system. The validity of this ordinance is assailed upon some thirteen grounds by the intervener, General Contractors Association of Utah. There may be some doubt as to whether the intervener, not being a resident, a voter, or a taxpayer within Provo City, is in any position to question the validity of the ordinances of the city, but since the points it makes and its argument are adopted by plaintiff, we shall pass that question and consider the points so presented.

At the outset, we may state that the ordinance referred to as the construction ordinance, or the ordinance for the construction of the power plant and distributing system, is not a contract between Provo City and the Ulen Contracting Corporation for the erection and construction of a power plant and distributing system. This was an ■ initiated ordinance and, as such, to be valid, must be of a legislative character. Only those matters which are strictly and properly legislative functions are subject to the initiative for their creation and existence. The making of detailed terms, approval of plans and specifications, selection of employees, particularly specialized help and the execution of contracts, are essentially acts involving fine distinctions, selections, exercise of discretion and judgment, to carry out and effectuate the legislative declarations and policies. It is the function of the legislative branch of government to determine and declare in matters of policy and procedure, and to establish what the law shall be. It is the duty of the executive branch to carry out such policies, to

execute the duties set up by legislation, and to do the acts necessary to make operative, put into effect and carry out the policies, principles, and rules laid down by the legislating body. While the legislative department and the executive department are not wholly independent and separate from each other, and no clear line of demarcation can be drawn between them, yet their functions in the main fall into rather clearly defined groups. Certain it is that only those activities or matters which are legislative and not executive lend themselves to the initiative processes.

But while the making and execution of contracts are essentially executive functions, the ordinance here involved may still be sustained as a proper exercise of the legislative power by the people through the initiative. As indicated above, this ordinance does not make a contract with the Ulen Contracting Corporation. Such an act could probably not be done by the initiative process. This ordinance, by its terms, is a legislative authorization for the city executive department to enter into a contract with the Ulen Contracting Corporation for the erection of a power plant and the construction of a distributing system. It is fundamental that the executive branch may not validly make and enter into contracts for the state, county, or city, except upon authorization of the legislating body, expressly given or implied as necessary or reasonably convenient for the effective discharge of the duties imposed on the executive by law. Had there been no initiated ordinance, the city commission must need take the proper proceeding to authorize the mayor and recorder to execute the contract. Such only was the import and effect of this ordinance, as initiated legislation; and the executive duty to carry out and make effective the declared legislative policy for the erection and construction of a municipal power plant and distributing system of capacity sufficient to meet the requirements declared by the people are duties thereby imposed upon the city commissioners as the executive department of the city.

The legislative authority has thus been granted for the making of a contract with the Ulen Contracting Corporation. The legislative body has therein defined the type of contract, the general terms, conditions and limitations of the contract which may be made by the executive department. This is a proper exercise of legislative functions and is properly done through the initiative process. The right of the executive department to enter into and execute a contract with the Ulen Corporation is confined within the limits thus fixed by the people. In view of the different interpretations placed upon this ordinance by the parties, and the attacks on its validity, it is imperative that we first declare what kind of a contract has been authorized. Two views or theories are advanced. One, that the ordinance provides for a contract whereby the Ulen Contracting Corporation undertakes and agrees to construct for Provo City an electric power plant and distribution system on a cost plus basis, subject to the limitations fixed in the ordinance; and the other, that the city is merely employing the Ulen Contracting Corporation as an agent or superintendent of construction to build for the city the plant and distribution system on a force account. The proposal submitted by the Ulen Corporation is in garbled phrases, some of which indicate the first theory and some the second theory. But to have any validity the ordinance must be for one or the other. It is clearly not in the alternative. We shall therefore examine the contract to determine its purpose, extent, and effect.

As to the first theory: The proposal reads:

"We will *design and construct* for Provo City * * * (A) An electric generating plant consisting of two (2) two-thousand (2000) kilowatt units *complete,* including land, water, trackage, building and all machinery, equipment and labor necessary and required to *fully complete said system ready for use.* (B) An electrical distribution system of *sufficient capacity* to furnish the City of Provo and its inhabitants with electrical energy, including all machinery, equipment and labor *necessary and required to fully complete said system ready for use."* (Italics supplied.)

It is further provided that the Ulen Corporation will "work in close cooperation with the City organization" and "turn the completed work over to you [the City] ready for use." The corporation then agrees to "require all sub-contractors" to carry insurance covering liability to the public and employees. There can be no sub-contractor without a primary or general contractor. There are other provisions in the proposal and in the ordinance which even more strongly show that the Ulen Corporation is to be a contractor on a cost plus basis. The ordinance expressly provides that, when the proposal is signed by the city, "it shall constitute an existing and enforceable contract" between the parties. The provisions governing the purchase of materials, letting of bids therefor, the payment for materials and labor, the rendering of monthly accounts to the city, all show that the Ulen Corporation is an independent contractor and not a city employee.

If the ordinance be construed according to the second theory, then many of the terms thereof are meaningless, contradictory, and some in violation of law. Under the second theory the validity of the entire ordinance may well be doubted, but upon that question we do not pass because we are of the opinion, and so hold, that this ordinance authorized a contract with the Ulen Contracting Corporation for the erection and construction of an electric power plant and distribution system, wherein the Ulen Corporation is not an employee or agent of the city to build on force account, but is an independent contractor to build the plant and system on a cost plus basis, under and subject to the terms and limitations fixed in the ordinance. By this ordinance the city, through its mayor and recorder, is authorized to enter into a contract with the Ulen Contracting Corporation wherein the latter agrees and undertakes to design, draw, and prepare detailed plans and specifications for an electric generating plant consisting of two 2,000-kilowatt units complete, and an electrical distribution system

of sufficient capacity to furnish the City of Provo and its inhabitants with electrical energy, which plans and specifications shall meet the approval of the city commission. The Ulen Corporation must further agree and undertake to erect and construct said plant and system, complete and ready for service, according to the aforesaid detailed plans and specifications, approved by the city commission; and to furnish all land, water, trackage, buildings, machinery, equipment, supervision and labor necessary and required to fully complete said plant and system ready for use; and to turn the completed work, the generating plant and distribution system, ready for use, over to the city. The Ulen Corporation is to pay for the machinery, equipment, and material, used or necessary to be used in the erection and construction of said plant and system, and all engineering, supervision and labor charges, *and under the statute must furnish a good and sufficient bond for the faithful performance and completion of the contract and the prompt payment of all persons supplying labor or materials used in the prosecution of the work.* Section 17-1-1 R. S. Utah 1933.

The construction of the plant and distribution system, all labor and materials, excluding all engineering and supervision charges, shall not exceed to the city the sum of $685,-000, but any savings from this amount are for the benefit of the city. That is to say, the city shall pay to the Ulen Corporation the actual costs of labor and materials, excluding engineering and supervision charges, but in no event exceeding $622,000. In addition to the actual costs but not exceeding the amount specified, the corporation is to receive as the "plus" on the cost plus contract the sum of $65,000, of which amount $35,000 represents full compensation for designing the plant and system and preparing detailed plans and specifications to the approval of the city commission; and $30,000 as provided in article VIII of the proposal for all engineering supervision and other services rendered or to be rendered by the Ulen Corporation. All purchases of materials

over $500 are to be let by bids to the advantage of the city, and acceptance of bids subject to the approval of the city. There are other limitations and conditions prescribed by the ordinance, but we have only called attention to those which must not only be involved in any contract made pursuant to this ordinance, but are proper to set forth in this opinion in considering the objections made to the validity of the ordinance.

This is the basis upon which the ordinance rests and upon which we consider the objections urged against it. There are thirteen points of attack upon the ordinance, numbered (a) to (m), inclusive. It is first urged that there was no meeting of the minds of the contracting parties as to the kind, character, and extent of the plant and equipment to be received by the city. This has already been disposed of. The ordinance is not a contract, but authority for the executive department of the city to enter into a contract to have constructed for the city *"a complete electric power plant and system."* We cannot assume that when the contract is made the city officials will execute a contract that does not meet the conditions upon which they were authorized to execute the same. Attack (b) is that the taxpayers of Provo were misled into voting as they did. The argument that a party was misled or deceived into making a contract is, of course, only available to a privy to the contract, the party who was deceived. However, what we have heretofore said disposes of this objection as well as (c) and (d) which are based upon claims of uncertainty as to the nature and size of the proposed plant.

Point (e) is that the ordinance provides for the funds of the city to be deposited with and disbursed by persons other than the officers of the city in violation of law. While the holding that this ordinance is not a contract but merely a legislative authorization for the making of a contract perhaps disposes of this question, we deem it advisable to add the following comment. Certain it is that the city is required

to keep its funds, from whatever source derived, in the hands of its officials or in a bank within the state, approved by the depository board, "except where necessary to deposit moneys in a bank or banks outside of this state in order to provide for payment of maturing bonds or other evidences of indebtedness or the interest thereon." Chapter 47, section 8, Laws of Utah 1933, as amended by chapter 53, Laws of Utah 1935. We must assume that when the city officials execute a contract for the construction of the plant, they will observe and obey the law and make no provisions for the deposit of the city's funds outside of the state, or for expenditure of the funds without official responsibility or accountability. See *Schieffelin* v. *Hylan*, 236 N. Y. 254, 140 N. E. 689. Points (f), (g) and (h) are without merit and are disposed of by what we have already said.

We come now to the point that the agreement with the Ulen Contracting Corporation was made without any call for bids. It is conceded by the intervener that there is no statutory requirement to call for bids on im- ■ provements of this kind. There are but two provisions in the statutes with reference to calling for bids by municipal corporations on making public improvements. Section 15-7-20, R. S. 1933, requires bids for any improvement estimated to cost over $6,000 to be paid for out of the *general funds* of a city of the second class, such as Provo. In the case of *Barnes* v. *Lehi City*, 74 Utah 321, 279 P. 878, we held that this section had no application to improvements to be paid for exclusively out of funds derived from the improvement. See, also, *Bohn* v. *Salt Lake City*, 79 Utah 121, 8 P. 2d 591, 81 A. L. R. 215. The other is section 3 of chapter 22, Laws of Utah 1933, 2d Sp. Sess., commonly known as the Granger Act. Since by its express terms, that section applies only to proceedings under that act, and since we hold this is not an improvement under that act, that section has no application. It is strenuously urged that, as a matter of policy, we should require the city to advertise and call for bids even for improvements under the special fund doctrine.

It may well be the better policy for cities to do all their improvements, over the specified amount, under the competitive bidding system, to invite competition, guard against favoritism, improvidence and extravagance, and fraud in awarding contracts, and, for the benefit of the public, to secure the best work and supplies at the lowest prices practicable, but the determination of policy is a matter for the Legislature and not for the court. We invite the attention and consideration of the Legislature to the matter and leave it there. We must apply the law as we find it and not assume to determine matters of policy. The law seems well established that in the absence of statutory requirements the city need not advertise for bids. McQuillin, Municipal Corporations, 2d Ed., vol. 3, § 1288, p. 862; *Schulte* v. *Salt Lake City,* 79 Utah 292, 10 P. 2d. 625.

Point (j) is that no bond is required under the ordinance. We have already pointed out that the city must require a bond to insure performance and payment for materials and labor. Points (k) and (l) have to do with the possibilities of waste in construction and delegation of power to the city engineer. We have held that the detailed plans and specifications must be approved by the city commission, as must also all purchases over $500. We assume that the city officers will do their duty as provided by law. When and if they do not, complaint may be made.

The last point is that this ordinance is so closely tied to the bond ordinance (Nuveen contract) that it must fail if the bond ordinance fails. The ordinance itself so provided, but since we have held the bond ordinance valid, the question is settled in favor of the city.

I concur, therefore, in the order quashing the writ, and permitting the city to proceed as indicated in the opinion.

MOFFAT, Justice (dissenting).

The principles and problems involved are limited. Such facts only as appear pertinent and necessary to a discussion of the issues will appear as the discussion proceeds.

A city is a municipal corporation, a creature of the state created by the Legislature. *McClintock* v. *City of Phoenix*, 24 Ariz. 155, 207 P. 611; *City of Worcester* v. *Worcester Consol. Street Ry. Co.*, 196 U. S. 539, 25 S. Ct. 327, 49 L. Ed. 591. A city, being a creature of the state, its present existence as well as its continued existence is dependent upon the sovereign will expressed through the legislative enactment creating it and it thus possesses such powers, and such powers only, as the Legislature confers. 43 C. J. 186, § 185, and cases cited.

Under the Constitution no fractional part of the state may organize itself into a city or municipal body or adopt a charter under the constitutional right and power to adopt a charter, until it has first become a city organized under the general law in pursuance of the general legislative enactment authorizing the organization of cities and granting powers to be so used when thus organized. *"Any incorporated city or town* may frame and adopt a charter for its own government,"* in the manner provided by the Constitution. (Italics added.) Const. Utah, art. 11, § 5.

Provo City is not a charter city and is therefore, as such city, limited in its powers to those powers granted by the general law. The city charter amendment to the Constitution of Utah is not a self-executing provision. In *Wadsworth* v. *Santaquin City*, 83 Utah 321, at page 347, 28 P. 2d 161, it was shown that cities (not charter cities, and there are no charter cities in Utah) have only such powers as are by law conferred upon them, and "When a power is conferred on municipalities, the method of exercising such power is, in the absence of restriction, usually within municipal discretion, but, when the method of its exercise is prescribed, such method constitutes the measure of the power." 1 McQuillin, Municipal Corporations, 2d Ed., § 386, p. 956; *Consumers' Coal Co.* v. *City of Lincoln*, 109 Neb. 51, 189 N. W. 643. In this state the power of cities to purchase, construct, extend, improve, repair, maintain, and operate certain public utili-

ties and other projects, including waterworks systems, is recognized or expressly granted in the Constitution and several statutes. Const. Utah, art. 11, § 6; article 14, § 4; R. S. Utah 1933, 15-7-4, 15-7-5, 15-8-14, 15-8-15; Laws Utah 1933, Second Special Session, c. 22, § 1, p. 41. So, also, several methods are prescribed by which waterworks or additions thereto may be acquired. They may be paid for out of current funds, R. S. 1933, 15-8-2, 15-8-87; or by the issue of general obligation bonds, Const. art. 14, § 4; R. S. 1933, 15-7-7, 15-7-8, 15-7-9; or by the levy of special taxes on the property benefited thereby, R. S. 1933, 15-7-46; or by the issue of revenue bonds in the manner prescribed in Laws Utah 1933, Second Special Session, c. 22, § 3, p. 42.

Similar powers, except less extensive, have been conferred on cities relating to methods prescribed whereby they may acquire, operate, and maintain electric power and light plants and systems. Const. art. 14, § 4; R. S. 1933, 15-7-7, 15-7-15, 15-7-16, 15-7-17, 15-7-18, 15-7-21, 15-7-22, 15-7-23, and 15-7-23x, as added by Laws Utah 1937, c. 17, p. 39; 15-7-62, as amended by chapter 18, p. 39, Laws Utah 1937; and sections 15-7-44 and 15-7-46.

The classical pronouncement of the doctrine announced in 1854 in the case of *Zottman* v. *City and County of San Francisco,* 20 Cal. 96, 97, 81 Am. Dec. 96, has been consistently followed and announces the doctrine adhered to in the Santaquin Case, as follows:

"The mode in which alone they could bind the corporation by a contract for the improvement of city property was prescribed by the charter, and no validity could be given by them to a contract made in any other manner. The rule is general and applies to the corporate authorities of all municipal bodies; where the mode in which their power on any given subject can be exercised is prescribed by their charter, the mode must be followed. The mode in such cases constitutes the measure of the power. Thus, where authority is conferred to sell property, with a clause that the sale shall be made at public auction, the mode prescribed is essential to the validity of the sale; indeed there is no power to sell in any other way. Aside from the mode designated there is a want of all power on the subject. This is too

obvious to require argument, and so are all the adjudications. Thus in *Head* v. *Providence Insurance Company*, 2 Cranch. [127], 156, [2 L. Ed. 229], Mr. Chief Justice Marshall, in speaking of bodies which have only a legal existence, says: 'The act of incorporation is to them an enabling act; it gives them all the power they possess; it enables them to contract, and when it prescribes to them a mode of contracting, they must observe the mode, *or the instrument no more creates a contract than if the body had never been incorporated.*' " (Citing cases.)

As indicated by Mr. Justice Folland in the Santaquin case, there are four ways in which waterworks may be acquired by cities. Electric power and light systems may be acquired in three ways, and, if the special assessment powers are applicable to the plant itself as to a lighting system on the basis of improvement to the property affected, then by four methods. Each method of acquiring an electric power and lighting system is inseparably bound to a method of payment, or, put in another form, no matter by what method acquired, the payment therefor must be by and through the method or methods of payment provided by the statutes. It is provided that:

"Whenever the board of commissioners or city council of any city or the board of trustees of any town shall contemplate making any new improvement to be paid for out of the general funds of the city or town, such governing body shall cause plans and specifications for, and an estimate of the cost of, such improvement to be made. If the estimated cost of such improvement, in case of a city of the first class, shall be less than $6,000, or in a town or a city of the second or third class less than $2,000, such city or town may make such improvement without calling for bids for making the same. If the estimated cost of such proposed improvement shall exceed the amounts above mentioned, the city or town shall, if it shall determine to make such improvement, do so by contract, after publication of notice for at least five days in a newspaper of general circulation printed and published in such city or town. * * *

"Nothing in this article shall be construed to require bids to be called for or contracts let for the conduct or management of any of the departments, business or property of such city or town, or for lowering or repairing water mains or sewers, or making connections with water mains or sewers, or for grading, repairing or maintain-

ing steets, sidewalks, bridges, culverts or conduits in any city or town."
Section 15-7-20, R. S. 1933.

The methods provided by statute are: (1) An electric power and lighting system may be acquired and paid for by the raising of general funds by the process of taxation, provided, and provided only that in so doing

"No debt in excess of the taxes for the current year shall be created * * * by any city; * * * unless the proposition to create such debt, shall have been submitted to a vote of such qualified electors as shall have paid a property tax therein, in the year preceding *such election*, and a majority of those voting thereon shall have voted in favor of incurring such debt." (Italics added.) Const. art. 14, § 3.

(2) By the issuance of general obligation bonds, "When authorized to create indebtedness as provided in Section 3 of this Article." (Above quoted.) But

"No *city*, * * * shall become indebted to an amount, including existing· indebtedness, exceeding four per centum of the value of the taxable property therein, * * * provided further, that any city of the first and [or] second class when authorized as provided in Section three of this article, may be allowed to incur a larger indebtedness, not to exceed four per centum * * * for supplying such city * * * with water, artificial lights or sewers, when the works * * * shall be owned and controlled by the municipality." Const. art. 14, § 4.

Section 15-7-7, R. S. 1933, is the legislative enactment following substantially the language of section 4 of article 14 of the Constitution above quoted, as applicable to second class cities. It is further provided by section 15-7-8, R. S. 1933, that

"When the * * * city council * * * shall have decided to submit the question of incurring such bonded indebtedness, it shall by order specify the particular purpose for which the indebtedness is to be created and the amount of bonds which it is proposed to issue."

and to provide for submitting the question to the qualified electors at the next general or at a special election called

for that purpose in accordance with the general election laws. Notice must be given and the form of the ballot is provided.

(3) By the levy of special or local taxes on property benefited by the proposed local improvement. Section 15-7-46, R. S. 1933:

"Special or local taxes may be levied by the governing body of any city * * * for constructing and maintaining * * * electric * * * plants for illumination, and the necessary means and cost of distribution; * * * *such taxes to be levied on the real estate lying and being within the district in which such improvements may be made, or for the benefit of which such taxes are to be expended, to the extent of the benefits to such property* by reason of such improvement or expenditure." (Italics added.)

(4) By the issuance of revenue bonds in the manner prescribed by chapter 22, Laws of Utah 1933, Second Special Session. It is there provided by section 3 that:

"Whenever the governing body of any county, city or incorporated town by at least two-thirds vote shall determine to proceed under this act to purchase or construct any project or utility [electric power and lighting systems included] covered by Section 1 of this act, it shall first cause a comprehensive estimate to be made of the cost of purchase or construction and operation *and of the net operating revenue thereof.*" (Italics added.)

Other pertinent provisions of chapter 22, supra, may be referred to later as to certain contentions otherwise presented. What has been quoted is sufficient for the present purpose, for the reason that defendants expressly admit they did not proceed under the provisions of chapter 22, referred to as the "Granger Act."

These constitutional and statutory provisions are here set forth in the beginning of this opinion because they are fundamental and as we believe exclusive and limit municipalities to the methods there prescribed for the exercise of the powers granted.

It is clear the proposed lighting plant was not intended to be acquired by any one or any combination of the four methods above referred to, namely, (1) imposition of general taxes as the amount exceeds the debt limit and the revenue for the current year; (2) nor by the issuance of general obligation bonds as the procedure was not followed and it is admitted the proposed obligation, if an indebtedness within the constitutional provisions, exceeds the debt limitation imposed; (3) nor by the imposition of special assessments for local improvements within any designated local improvement district; (4) nor by procedure under the Granger Act, as specifically admitted, and, if it were not admitted, it is shown by the record. It is therefore manifest that some other authority and method of procedure must be found if the procedure and operations for acquiring, purchasing, and operating the proposed electric light and power plant and system are to be sustained.

It is provided that when a power is conferred upon a city or town and the manner of exercising that power is not specifically pointed out, the governing body "may provide by ordinance the manner and details necessary for the full exercise of such powers." Section 15-7-2, R. S. 1933. This section and other related sections were cited and construed in the case of *Fjeldsted* v. *Ogden City*, 83 Utah 278, 28 P. 2d 144. That case was decided before the passage of the Granger Act. It was there said, in substance, that the statute provides for the issuance of bonds by cities in sections 15-7-7 and 15-7-9, R. S. 1933, but these bonds if issued must be issued within the constitutional debt limit and only when authorized by a majority of the qualified electors, and when bonds are issued the constitutional debt limit restricts the amount and the statute prescribes the method. If warrants (current year warrants or anticipation warrants) are used as the basis of borrowing or anticipating revenue for corporate purposes, the current revenue for the current year again imposes its limitations so that although cities may borrow money on the credit of the corporation against

current revenues for the current year for corporation purposes in the manner and to the extent allowed by the Constitution and the laws and issue warrants and bonds other than revenue bonds and in such form and upon such conditions as the governing body may determine, section 15-8-6, R. S. 1933, both of these forms of financing have the limitations hereinbefore indicated. They are not available in the instant case and may not be made so.

The case of *Barnes* v. *Lehi City*, 74 Utah 321, 279 P. 878, recognized the power of a city to enter into a conditional sale contract and to issue future maturing "pledge orders" payable solely from the revenue anticipated to be derived from the use and operation of the property purchased. On its facts, that case went no farther, or if it did, it has been limited by the Fjelsted Case. In the latter case the problems could be differentiated on two grounds. First, in the Ogden Case the evidences of the obligations to pay were denominated "bonds," not special revenue bonds, while in the Lehi City Case they were denominated "pledge orders," drawing 6 per cent interest, without indicating what sort of obligation or "pledge orders" they were. Second, the Fjeldsted Case limited the income available for payment of bonds to the revenue derived solely from the new capital invested and prohibited the allocation of revenue from other sources to the payment of the proposed bonds. In the Lehi City Case "the question of power in a city to incur the particular form of obligation therein approved was not discussed," although much was said in approval of the so-called "Special Fund Doctrine."

There is a statute granting power to municipalities to "construct, maintain and operate * * * electric light works, * * * or purchase or lease such works from any person or corporation." Section 15-8-14, R. S. 1933. The governing body may contract for the lighting of streets, public buildings, and other places. Specific provisions are made for payment. Sections 15-7-7, 15-7-8, and 15-7-9.

We have been unable to discover any reference either in the Constitution or the statutes to conditional sales contracts as relating to cities, and, until the passage of the Granger Act, no mention either in the Constitution or statutes has been made of the "Special Fund Doctrine" or "self-liquidating" bonds of the type referred to in that act. Assuming, without conceding, that such a warrant, contract, or bond is not an indebtedness (?) within constitutional provisions, and recognizing as the statute declares, section 3, "The principal of and interest upon such bonds shall be payable solely from the net revenues derived from the operation of the project or service for the purchase or construction of which they are issued," and that "In no case shall the principal or interest of such bonds be made a charge upon the taxable [tax] revenues of such county, city or incorporated town," and that "No bond or coupon issued pursuant to this act (section 3 of the Granger Act) shall constitute an indebtedness [?] of such county, city or incorporated town within the meaning of any state constitutional provision or statutory limitation," still, are not the powers, methods, and limitations as adequately and as completely covered by the statute as any of the other methods or powers granted to cities? And may the things that might or could have been done under the decisions in the Barnes v. Lehi City Case, the Fjelsted Cases against Ogden City, and the Wadsworth v. Santaquin Case be done under the procedure required and imposed by the Granger Act?

Passing the question as to whether or not an obligation to pay out of a designated "special revenue," by whatever name designated, is or is not an indebtedness within constitutional inhibitions, and looking solely to the powers, methods, and means of purchasing, constructing, or operating an electric lighting system, there arises a classification of powers and methods for obtaining revenue, and that classification produces two classes; one, funds arising from general revenues, and the other, arising from special revenues resulting from the operation of the utility purchased

or proposed to be purchased from the funds invested or proposed to be invested therein or the improvement made. Put otherwise, and as broadly as any advocate of the free and unlimited application of the so-called "Special Fund Doctrine" might contend, the city revenues are either from direct tax levies in some form or revenues from income-producing public utilities. In any event, the citizen taxpayer or beneficiary of the utility or improvement is the ultimate source of the revenue produced and the methods by which he is ultimately required to pay make little difference. The distinction between "the governing body," the "corporate entity," the "body politic," and the organized body of people constituting the city for whom and by whose right and in whose name the governing body acts or operates, is a distinction wanting in substance. Traced to its source, "special revenues," under any or all of the decided "Special Fund" cases, comes from the particular property or the operation of the property purchased by the fund it produced by way of taxpaying in the good old fashioned way, or by the payment for a service or a benefit rendered.

Notwithstanding section 2 of the Granger Act provides that the "act shall be construed as a cumulative *statutory* authority" for the purposes named "and shall not be construed to repeal any existing laws with respect thereto," and declares the *intent of the act* is to create *"an additional and alternate statutory method* for the purposes herein named," it would inject a new doctrine to charge the Legislature with enacting judicial opinions into legislative enactments by implied reference to what courts had held former legislative enactments were intended to mean. The Legislature may put into a law passed a doctrine approved by the courts. It is, however, a vastly different thing to say that because the courts have said a power is vested in a municipality by virtue of a law that when the Legislature specifies by statutory enactment that an alternate statutory method is provided, that the opinion of the court as to the interpretation

of the statute previously interpreted is the alternate statutory method.

If the purpose of the Granger Act was not to provide an alternate statutory method of financing the construction of of the utilities named in the act by a method not formerly provided by statute, then it would seem to have failed of its purpose. The alternate method prior to the passage of the Granger Act of securing an electric lighting system was by the issuance of general obligation bonds, or, if one cares to play upon the meaning of "alternate," any one of the other methods by which such specified statutory provided utilities could be acquired, and certainly cannot be interpreted to mean that the Legislature intended to enact into the Granger Act what was previously decided by the Barnes v. Lehi City Case and cases like it, or, if it did, the legislative enactment pre-empted the field. If it was not the purpose of the Granger Act to make use of the so-called special fund doctrine as applicable to the utilities referred to in the act, then to what purpose was the Granger Act directed?

The record discloses that none of the four existing statutory methods have been followed. In this respect defendants have taken, as they must do, the laboring oar and contend that the Barnes v. Lehi City Case had judicially recognized a method of creating municipal indebtedness other than the methods provided by statute. This means judicial legislation and not legislative construction or interpretation.

In the absence of constitutional limitation or restriction or other irreconcilable conflicts, the state Legislature has plenary power to create municipal corporations by general law only and confer such powers as to it may seem proper and advisable; alter, amend or repeal such laws as relate thereto. To say that when a power is conferred, and the manner of exercising that power is prescribed and that municipalities have only such powers as are expressly granted and those necessarily or fairly implied in or incident to the powers expressly granted or those essential to the declared objects and purposes of the corporation, it is but a

corollary of that principle. To say that there is likewise an implied inhibition against any power not expressly conferred or the right to exercise a power or a method not provided by law or ordinance or in a different manner from that prescribed, is denied by all the authorities. *City of Des Moines* v. *Gilchrist*, 67 Iowa 210, 25 N. W. 136, 56 Am. Rep. 341.

"The settled rule is that statutes, granting powers to municipal corporations, are to be strictly construed, and any fair and reasonable doubt as to the existence of such powers is resolved against the municipal corporation claiming the right to exercise them." *Potson* v. *City of Chicago*, 304 Ill. 222, 225, 136 N. E. 594, 596; *Interstate Power Co. of Nebraska* v. *City of Ainsworth*, 125 Neb. 419, 250 N. W. 649; *Schieffelin* v. *Hylan*, 106 Misc. 347, 174 N. Y. S. 506, 511.

In the case of *State* v. *Salt Lake City*, 35 Utah 25, 99 P. 255, 18 Ann. Cas. 1130, it was held in relation to a notice of election and some minor verbal inaccuracies or surplusages in the ordinance, that, if the statute was not literally, it was at least substantially, complied with. In the instant case substantial compliance is not claimed, and if it were it could not be supported.

"When a statute enumerates the persons and things to be affected by its provisions, there is an implied exclusion of others." *Nelden* v. *Clark*, 20 Utah 382, 59 P. 524, 526, 77 Am. St. Rep. 917.

The case of *Wadsworth* v. *Santaquin City*, supra, applies the principle and supports the doctrine. It is not necessary to restate the facts. It is likewise not necessary to point out either generally or particularly wherein the Granger Act was not complied with in the instant case, as admission has disposed of that. Some of the many cases bearing upon this subject are: *Colorado Central Power Co.* v. *Municipal Power Development Co.*, D. C., 1 F. Supp. 961; *Kansas Power Co.* v. *Fairbanks, Morse & Co.*, 142 Kan. 109, 45 P. 2d 872; *State* v. *McWilliams*, 335 Mo. 816, 74 S. W. 2d 363. Other cases might be cited and other cases are referred to in the cases cited. Further citations would be cumulative.

Defendants take up the cases last referred to and others cited by plaintiff and claim all of them are distinguishable from the instant case. On the facts, many of them are; but the principle of law that where a power is conferred on a municipality and the method is prescribed, such method must be substantially followed and constitutes the measure of power, is uniformly approved and we have found no case rejecting that principle.

It will be observed the wording of the statute is, "to create an additional and alternate *statutory* method." No other method of issuing bonds than the statutory method exists. Courts may not devise or create methods of creating municipal indebtedness or otherwise. Such power must come from the legislative powers found in the statutes creating and granting municipal power and defining their functions. The act pertinently provides that it shall not be construed as authorizing a breach of any valid lien or contract theretofore legally created or entered into. The declared intention is "to authorize the pledging, setting aside and segregation of the net revenues of the project or service, or the part thereof allocable to any improvement or extension" provided for by the act. Section 19. *Rorick* v. *Dalles City,* 140 Or. 342, 346, 12 P. 2d 762.

It is contended that Provo City does not need to rely upon the Granger Act, but that, under the powers granted by the Constitution and general laws of the state, the ordinances and proposed contracts may be adopted by an exercise of the initiative so vested in the people of Provo City, and "that the legislature is without power to adopt any restriction upon the powers of the people acting under the initiative to enact ordinances or laws of a purely legislative character which, in the case of voters of municipalities, are wholly local in scope." The article of the Utah Constitution relating to the "Legislative department" of the state government contains the following language:

"The Legislative power of the State shall be vested:

"1. In a Senate and House of Representatives which shall be designated the Legislature of the State of Utah.

"2. In the people of the State of Utah, as hereinafter stated:

"The legal voters or such fractional part thereof, of the State of Utah *as may be provided by law, under such conditions and in such manner and within such time as may be provided by law,* may initiate any desired legislation and cause the same to be submitted to a vote of the people for approval or rejection, or may require any law passed by the Legislature (except those laws passed by a two-thirds vote of the members elected to each house of the Legislature) to be submitted to the voters of the State before such law shall take effect.

"The legal voters or such fractional part thereof *as may be provided by law,* of any legal subdivision of the State, *under such conditions and in such manner and within such time as may be provided by law,* may initiate any desired legislation and cause the same to be submitted to a vote of the people of said legal subdivision for approval or rejection, or may require any law or ordinance passed by the law making body of said legal subdivision to be submitted to the voters thereof before such law or ordinance shall take effect." (Italics supplied.) Const. Utah, art. 6, § 1.

That the italicized parts of the section just quoted referring to such matters "as may be provided by law," etc., refer to laws passed by the Legislature, needs no construction. As constitutional provisions they are not self-executing. *Long* v. *City of Portland,* 53 Or. 92, 98 P. 149, 1111.

The Granger Act was passed by the state Legislature by the necessary two-thirds vote to make it effective upon approval. By its terms it became "effective immediately upon its passage and approval" August 8, 1933. It was not subject to referendum under the constitutional provision even if the state as a whole had desired such referendum. May a city then, by a referendum proceeding which is limited by statute, set at naught a legislative act upon the same subject? Or may an ordinance be originated and passed or after origin be submitted and adopted by the qualified electors of any city, so that by such method of financing a utility may be acquired? Or may a city or town after its incorporation under the general law providing for the organization, classification, and granting of powers, then by a pro-

cedure not provided in the Constitution become a "charter city," or enlarge its powers in such regard except by proceeding as the Constitution and statutes provide? Surely it cannot be the law that when the Legislature has covered the subject of incurring indebtedness (?) or securing public utilities by means of a proceeding to issue and dispose of special revenue bonds that the Legislature did not intend to do what it did. If a city may by ordinance, passed by the city commission, approved or not by an initiative or referendum vote, provide new or other methods or vest other powers than those granted or established by the Legislature, or if courts may do likewise, where shall the limitations be? Or if there are none, where will the end be?

Corporations for municipal purposes shall not be created by special laws but the Legislature is authorized to provide by general laws for the incorporation, classification, and organization, and by such general laws may grant to or withhold from the municipalities so created such powers as to the Legislature shall seem proper. This grant of power to the Legislature to enact general and uniform laws relating to municipal corporations constitutes in itself a limitation upon the power of municipalities whether acting through their regularly constituted legislative bodies or whether acting or attempting to act directly through initiative legislation. To permit a municipality to legislate by the initiative rather than in pursuance of and in conformity with the powers conferred by the Legislature would have the effect of destroying the uniformity of municipal law as contemplated by the Constitution. The Legislature by the enactment of general and uniform laws has created and organized municipalities and it is under the general law thus enacted they must operate. To permit an ordinance to originate by the invocation of an initiative proceeding to disregard, supersede, or override the general powers, laws, and limitations imposed upon municipalities by general law, is to permit the municipality, a creature of the law, to rise higher than the source giving it power and extend the sphere of its

power and operation beyond that of the power creating it. *Galvin* v. *Board of Supervisors,* 195 Cal. 686, 235 P. 450; *Newson* v. *Board of Supervisors of Contra Costa County,* 205 Cal. 262, 270 P. 676.

The cases where "chartered cities" draw their powers by direct constitutional grant or where the powers granted by charters authorize legislation of equal or co-ordinate authority with that of legislative enactments, have no application under the situation presented in the instant case. Nor is a situation such as is presented in the case of *Long* v. *City of Portland,* 53 Or. 92, 98 P. 149, 1111, applicable where, as there, the Constitution, article 11, § 2, as amended in 1906, provided that, "The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the constitution and criminal laws of the state of Oregon," although it was also provided that corporations may be formed under general laws but shall not be created by special laws.

Nor do the California, Arizona, or Oklahoma cases aid. Those cases are "charter" provision and initiative cases. It is sufficient to indicate the trend and meaning of two or three of the California cases as typical of the nonapplicability of the holdings. As previously indicated there are no "charter" cities in the state of Utah, neither by initiative proceeding nor otherwise. In the case of *In re Pfahler,* 150 Cal. 71, 88 P. 270, 277, 11 L. R. A., N. S., 1092, 11 Ann. Cas. 911, the charter was adopted under and pursuant to a constitutional provision. The legislative powers provided for under the charter were drawn directly from the Constitution. As was held in that case:

"As to municipal affairs, it is sufficient if the provisions of a charter are consistent with the Constitution. * * * The constitutional grant to a city to frame its own charter, which, when ratified and approved, shall become its organic law, necessarily assumes that the form of government to be provided therein need not be the same as that provided by the Legislature for municipalities generally, and it was for the very purpose of enabling cities to have such a local or-

ganization as their local needs demanded that the authority to frame a charter for its own government was given."

. Had Provo City by virtue of initiative proceedings and constitutional authority proceeded to adopt a charter for the municipality and had included therein the power to legislate upon matters such as are involved in the instant case, charter provisions springing directly from constitutional authority, thence through the charter to the municipality, an entirely different situation would be presented. This being the exercise of a constitutional power, superior recognition would be given to a general law relating to municipal corporations. We have no such situation here, hence such cases as *In re Pfahler*, supra; *Dwyer* v. *City Council of Berkeley*, 200 Cal. 505, 253 P. 932; and *Hurst* v. *City of Burlingame*, 207 Cal. 134, 277 P. 308, are not persuasive. No power is yet vested in Utah cities whereby in the exercise of powers or methods of procedure such cities may go around the Legislature and either claim, exercise, or establish powers not yet given by the Legislature.

We are persuaded the Granger Act is and must be, in the very nature of the municipal setup in the state of Utah as now existing, the exclusive method, procedure, and measure of the power whereby such public utilities as are by that act authorized to be acquired by the pledging of the net revenues of the utility to be so acquired, constructed, or operated, may be acquired, and that cities desiring to so acquire such utilities must conform to the legislative provisions having reference thereto.

In the case of *Trenton* v. *New Jersey*, 262 U. S. 182, at page 187, 43 S. Ct. 534, 537, 67 L. Ed. 937, 29 A. L. R. 1471, it is said:

"In the absence of state constitutional provisions safeguarding it to them, municipalities have no inherent right of self-government which is beyond the legislative control of the state. A municipality is merely a department of the state, and the state may withhold, grant or withdraw powers and privileges as it sees fit."

Under the Granger Act whenever the governing body of any city shall determine to proceed under the act, it is first required that a comprehensive estimate be made of the cost of purchase or construction and operation and of the net operating revenue by a competent engineer approved by the state engineer, and one having "no connection with any manufacturer or seller of machinery, pipe, or other equipment" to be used in the project. The act declared the "governing body" by ordinance, or "other proper legislative enactment," "shall set forth a brief description of the contemplated improvement," and provides for the issuance of bonds: "Such bonds may be sold at either public or private sale upon such terms" as specified, to an agency of the United States; but, except when sold or disposed of to an agency of the United States of America, "such bonds shall be sold only after advertisement and upon bids" after at least ten days' notice in some newspaper having a general circulation in the city.

The record discloses no such proceedings. Such plans and specifications as are referred to were prepared by the people proposing to buy the bonds and to build the plant and system. The whole scheme bears the imprint of one promoted by the proposed contractors on their own terms, at their own price, and to put the city into the electric lighting business without risking a cent of their own money. Whether or not the bond company and the construction company, or either of them, may obtain an unconscionable advantage, only future developments may determine. Certainly, at the present time they are taking no risk themselves. No one else had any information as to plans and specifications or an opportunity to bid upon the proposed purchase, sale, or construction.

Nothing appears from which anyone could obtain information should he desire to bid upon the system as to the type of building, its size, the size, quality, or number of poles, types of transformers, or the kind, size, or type of wire to be used. The whole proposition is one of putting the

money where the contractor may spend it and letting developments reveal what happens.

Surely when the Legislature provided the details relating to specifications, plans, notices, qualifications of engineering skill, etc., the Legislature intended that such projects should be open for genuine competitive bidding, upon a particularity of propositions, such that bidders may really compete and have in mind precisely the same things upon which they are bidding.

In this instance, Provo City had no independent expert advice. Apparently it adopted—if it may be said at the time of the passage of the ordinance and the voting thereon that there were any plans and specifications at all—very sketchy and incomplete plans and specifications. Such procedure not only violates the statute requiring work to be given to the lowest responsible bidder after ample advertisement, but is contrary to the plainest duties and sound dictates of public business practice.

"Public officials should not be permitted to thus, play fast and loose with the funds of its citizens [be they special or otherwise]. A business enterprise thus initiated is foredoomed to failure, and to involve the citizens in a costly experiment." *Colorado Central Power Co.* v. *Municipal Power Development Co., Inc., et al.,* D. C., 1 F. Supp. 961, 966.

For a classification and citation of many of the cases relating either to the adoption, rejection, or modification of the so-called special fund doctrine, reference may be had to the case of *State* v. *City of Miami,* 113 Fla. 280, 152 So. 6. A number of cases are there cited and classified. The cases decided since the end of 1933, the date of the decision of the Florida case, relating to the special fund doctrine, would be but cumulative to the collection and classification made.

We need not enter into such matters as to whether or not the proposals and ordinances are not merely options on the part of the companies proposing to finance and construct the proposed electric power and lighting systems; as to

whether or not the power plant site and the water rights which the record discloses are presently owned by the city (although the proposal proposes to secure the same) would not require an allocation of revenue as indicated in the Fjeldsted Cases and the Santaquin Case, and as provided by the Granger Act; and as to whether or not under the ordinances and proposals there was not in contemplation of law a presently vesting of the property, making it municipally owned and controlled and, therefore, the income therefrom constituting general revenue within many of the cases. Also as to whether or not the proposed ordinances and proposals amount to a delegation of legislative power or an abdication of power in favor of a possible contractor for the construction of the system by giving to the proposed contractor powers either to proceed to secure bids and let contracts (subject, however, to municipal approval), or to construct the plant itself. We refrain from doing so, believing that the discussion so far eliminates the necessity therefor and would unnecessarily lengthen this opinion.

Whether or not it was the intention of the Legislature to approve and adopt the special fund doctrine, as discussed and limited by the cases decided by this court, we need not speculate. The statute has prescribed and limited the manner of proceeding, the requirements and limitations upon acquiring, constructing, and paying for certain utilities out of the revenue to be derived from the operation thereof. No question being raised as to the statute, it is our duty to conform thereto. In view of the definite admission that the proceedings relating to the proposed issue of revenue bonds as prescribed by the Granger Act have not been followed, notwithstanding the argument that they need not be, and in view of the further fact that the statute expressly provides a method by which certain utilities may be acquired and paid for from the revenues derived solely from the income of the property so acquired, whether an addition, a construction or an independent improvement in which the fund so secured and the income from which is definitely

separable, and in view of the further provision that such bonds shall not be regarded as a "debt"; and it further appearing that none of the other statutory provisions relating to acquiring such utility and providing for the payment therefor have been complied with, it is my opinion that there is no escape from the conclusion that the temporary writ of prohibition heretofore issued should be made permanent.

FOLLAND, Chief Justice (dissenting).

I concur in the dissent of Mr. Justice MOFFAT.

My position may be briefly stated. The so-called "Special Fund Doctrine" (with certain limitations) is well established in this state by judicial decision, by legislative enactment of the so-called Granger Act, chapter 22, Laws of Utah 1933, Second Special Session, and by the amendment to the Constitution of 1932, section 5, art. 11. Provo City, not having availed itself of the powers of a charter city under the constitutional amendment, is limited in its efforts to obtain funds for a municipal power and light plant and distribution system to one of the methods provided by statute. The statutory method applicable to the city's situation, as shown by the facts in this case, is that provided by the Granger Act, and the requirements of that act should be met. A municipal corporation desiring broader powers than those given by statute must organize under the constitutional amendment of 1932. I cannot concede that a municipal corporation has powers broader than those granted by statute when it attempts to proceed by vote of its people rather than through its council or commission. In either event the corporate powers are the same. I cannot believe that the Legislature intended by the Granger Act to so divide the corporate powers that the people of a city by initiative or referendum might exercise such powers without the limitations or restrictions applicable to a city commission.