BIGLER, et al. v. GREENWOOD, et al.

No. 7915.   Decided March 10, 1953.   (254 P. 2d 843.)

See 63 C. J. S., Municipal Corporations, sec. 1399. Validity of Assessment for drainage improvement. 17 Am. Jur., Drains and Sewers, sec. 67; 2 A. L. R. 625.

*William S. Frank,* Salt Lake City, for plaintiffs.

*Alvin I. Smith* and *Herbert F. Smart,* Salt Lake City, for involuntary party plaintiff.

*Frank E. Moss,* County Atty., *W. T. Thurman* and *Edward W. Clyde,* Salt Lake City, for defendants.

CROCKETT, Justice.

This is a proceeding for an extraordinary writ to prohibit defendants as Commissioners of Salt Lake County and as Directors of the Salt Lake City Suburban Sewer District from going forward with a project which was initiated to create, finance, construct and operate a sewer system for a certain designated area lying south of Salt Lake City in Salt Lake County.

The parties do not dispute that due to the rapid growth and development in the area, particularly during World War II and since, existing methods of private sewage disposal, cesspools, septic tanks and "outside plumbing," are a menace to health so that it is highly desirable that an

efficient sanitary system for the disposal of sewage be created. Joining defendants in this objective, plaintiffs state in their brief,

"It is our earnest belief that a sewer project in the area concerned should be constructed at the earliest possible date."

They aver that they are not trying to prevent nor do they desire to delay construction of the sewer, but contend that the the plan pursued to date arbitrarily imposes undue burdens upon them as property holders within the district and that it is without authority of law.

Defendants have proceeding under Sections 1 and 8 of Chapter 6a, Title 19, U. C. A. 1943[1], to set up a sewer district, construction project and financing plan. This was initiated by a series of resolutions, October 9, 1946 and March 18, 1947.

Various impedimenta were encountered, the amount of the bonds to be issued was changed several times, and the interest rate was also increased. As a result of much consideration and discussion concerning the entire proposal, on April 5, 1948 the defendant Commission adopted a resolution which recited:

"All bids for the construction * * * being excessive, and numerous objections * * * under the proposed method of financing thereof have been made * * * the Board of County Commissioners deem in [sic] inadvisable * * * to proceed * * *"

and thereupon duly resolved to abandon the project and rescinded the resolution of March 18, 1947.

No further action was taken until four years later. In the spring of 1952, the defendants caused a further study to be made which led to the next significant action. On October 6, 1952 defendants moved to reactivate the project

---

[1]Now Sections 1 and 8, Ch. 7, Title 17, U. C. A. 1953.

by adopting a further resolution reciting that the action of April 5, 1948

"is hereby declared to have been adopted by mistake and is hereby expressly repealed * * *"

and that the proceedings of March 18, 1947

"are hereby approved, ratified and declared to be * * * in full force * * * in all respects as though said resolution of April 5, 1948 had never been adopted"

and proposed to go forward with the program, the issuance of bonds, the letting of a contract for construction, all of which was interrupted and is held in abeyance by this proceeding.

In assailing the legality of the defendants' proceedings, plaintiffs contend:

1. That when the last mentioned resolution was adopted October 6, 1952, Chapter 6a, Title 19, U. C. A. 1943, under which defendants claim authority for their program, had been rendered null by implication or replacement because the Legislature had comprehensively covered the field of the creation and operation of sewer districts in later enactments.[2]

2. That even if the foregoing contentions were not so, Section 8 of said chapter which relates to the financing program, by its express language, is limited to projects "* * * under the laws of the United States relating thereto," i. e. projects, under Federal financing, which this admittedly is not.

3. That certain of its terms are so vague as to be incomprehensible and therefore incapable of interpretation and application.

---

[2]Laws of Utah 1947, Ch. 25; Laws of Utah 1949, Ch. 24, as amended by Laws of Utah 1951, Ch. 32, 17-6-1 to 19, U. C. A. 1953.

4. That it violates the constitutional prohibition against creating a "special commission" which would interfere with municipal functions.[3]

5. That the proposed indebtedness (eight million dollars) exceeds the constitutional debt limit of 2% of the assessed valuation of taxable property.[4]

6. That as defendants have interpreted and attempted to apply Sections 1 and 8 of said Chapter 6a, in forcing liens upon the plaintiffs' property, would amount to a deprivation of property without due process of law contrary to the constitutions of the State of Utah[5] and of the United States.[6] It is expedient that we discuss this last contention first.

Plaintiffs point out that said Sections 1 and 8 relating to the creation of the district and the borrowing of money to finance it make no provision as to notice, objection or hearing so that the residents are given no voice in its creation, size, whether one's property should be included, or whether it would be benefited; and likewise that no such safeguards are afforded with respect to the obligation to be incurred, the issuance of bonds, the imposition of charges or rates upon the plaintiffs, the method of payment or the allocation of the burden. They argue the impropriety of leaving all of such matters to the exclusive direction and control of the defendant Commission, which is not selected by, nor responsible to the residents of the district, which they aver has resulted in an arbitrary and inequitable burden being placed upon them in the establishment of the district and the construction of the sewer project, the main aspect of the inequity being that the present 8600 householders are required to bear practically the entire burden

[3]Art. 1, § 2; Art. 6, § 29, Constitution of Utah.
[4]Art. 14, § 4, Constitution of Utah.
[5]Art. 1, § 7, Constitution of Utah.
[6]14th Amendment, U. S. Constitution.

of the installation of a sewer system designed to take care of eventually 40,000 to 45,000 homes, while the owners of vacant property in the area, whose lands will also be benefited by the presence of the sewer system, are not compelled to bear any of the costs. The net result of all of which, say plaintiffs, amounts to an arbitrary invasion of their rights and deprives them of their property without due process of law.

Defendants claim that the procedural requirements insisted upon by the plaintiffs are not necessary, their position being that the plan is simply "revenue bond" financing which the residents of the area are voluntarily entering into. They contend that the bonds are to be paid solely out of revenue to be collected from the operation of the district; that the district does not pledge the private property therein nor obligate itself to assess or tax the property, that there is thus no lien nor burden placed upon it so that there is no "taking" as a consequence of which the requirements of notice, opportunity to object and hearing are not essential, relying on cases previously adjudicated by this Court, the so-called "special fund" cases.[7]

To the contrary, plaintiffs maintain that the plan being carried out by defendants makes it compulsory for the property owners to give liens on their property so that it amounts to "assessment" financing, taking it out of the "special fund" class of cases and bringing it under the class of cases where the district levies special assessments or imposes taxes which do become a lien upon the land. In the latter class of cases, the law is well established by our previous decisions that due process

[7]*Utah Power & Light Co.* v *Ogden City*, 95 Utah 161, 79 P. 2d 61; *Utah Power & Light Co.* v. *Provo City*, 94 Utah 203, 74 P. 2d 1191; *Wadsworth* v. *Santaquin City*, 83 Utah 321, 28 P. 2d 161; *Fjeldsted* v. *Ogden City*, 83 Utah 278, 28 P. 2d 144; *Barnes* v. *Lehi City*, 74 Utah 321, 279 P. 878.

of law does require notice and an opportunity to be heard prior to the imposition of a lien upon one's property.[8] This principle defendants willingly concede.

The nub of the controversy between the parties litigant here is as to which of the two classes of cases just mentioned the proposed financing program correctly falls into.

The exigencies of the situation confronting defendants apparently have placed them in a dilemna: On the one hand they are under the necessity of making the bonds marketable at a favorable price, keeping down the cost of financing and the interest rate which can only be accomplished by having the bonds become a lien or charge upon the property so that the property stands as security for paying off the bonds; on the other hand, it is a great deal more expeditious and convenient to go forward on the theory of a non-lien financing program as it was initiated under the old statutes, Section 1 and 8, Chapter 6a, Title 19, U. C. A. 1943, which would avoid the trouble, expense and delay of complying with the formal requisites of proceeding as outlined in Sections 2 to 7, inclusive of the above chapter, or later laws on the subject.[9]

In order to determine whether the program is in fact a non-lien, purely "revenue bond" financing plan, or one which creates a charge upon the property, we are obliged to look at the over-all project and what it amounts to in its essential elements and result rather than any euphonious title or innocent-appearing form in which it may be enshrouded.

First, each householder within the district whose property is "within 200 feet of the sewer" is under mandate of a county ordinance to connect with the sewer.[10] The ordinance is unquestionably valid and

---

[8]*Argyle* v. *Johnson*, 39 Utah 500, 118 P. 487. See *State ex rel. Lundberg* v. *Green River Irrigation District*, 40 Utah 83, 87, 119 P. 1039.

[9]See note 2, supra.

[10]Adopted May 18, 1942 as amended May 16, 1951.

enforceable.  The County Commissioners

"* * * may make and enforce * * * all such local * * * sanitary regulations as are not in conflict with general laws"[11]

and

"* * * make such provision for the preservation of health * * * as they may deem necessary * * *."[12]

Such an ordinance is undeniably proposed to protect the health and welfare and is therefore a valid exercise of authority expressly conferred under the police power.[13]

The householder therefore has no choice other than to connect with the sewer.  Under defendants' plan he was required to sign up by a certain day or suffer a penalty of $100.  Five plans for payment were offered.  Four of them expressly provided for liens on his property to stand back of his contract and insure payment of the charges.  Only one did not contain the express lien provision.  Under it he is required to pay the full connection fee in cash (usually $150) and advance 18 months' service charge at $3 per month, totaling $54, to be kept on deposit as a guarantee of payment.  A threat was also made that if any charge remained unpaid the culinary water to the residence would be cut off.  This alternative of paying in cash, plus keeping on deposit 18 months' advance payments, amounts to an iron-clad guarantee of payment so the necessity for any lien is eliminated.  The burdens of this plan were such that only six out of more than 6,000 applicants who signed up selected it, which itself demonstrates the "voluntariness" of the residents' entry into the lien contract. As to owners of three or more vacant lots who desired to sign up, and as to multiple unit owners who had to sign up,

[11]17-5-35, U. C. A. 1953.

[12]17-5-49, U. C. A. 1953.

[13]*Hutchinson* v. *City of Valdosta*, 227 U. S. 303, 33 S. Ct. 290, 57 L. Ed. 520.

the only application form furnished contained the lien provision.

A fair and realistic appraisal of the plans offered shows unmistakably that the home owner was left without choice. He had to connect; and he had to pay or a lien would attach to his property. That this result was what was intended by the Commission is clearly indicated in the activating resolution of March 18, 1947.

"* * * it being the intention to finance the installation of said sanitary sewer system * * * under the issuance of revenue bonds * * * payable * * * from the operation * * *, and *since it is contemplated that the charges * * * will constitute liens against the property* in said district, enforceable in the event of a default in the payment of such charges * * *, this resolution shall be filed for recording in the office of the County Recorder of Salt Lake County and when so recorded *shall constitute notice* to all persons of the existence, either present or future, *of such liens on the property in said district*." (Emphasis added.)

and also by their representation contained in their "covenant to the bondholders" which was similar.[14]

"All signed application agreements * * * are hereby recognized as enforceable against the properties covered * * *. The Board agrees that it will do all things necessary to protect *the lien constituted by such agreements against said properties* * * *, the Board will cause to be done everything necessary to foreclose the lien of the property * * *. The expenses of such foreclosures shall be payable from the sale proceeds. * * * The filing in the office of the County Recorder of the resolution * * * shall constitute notice * * * of the present or prospective existence of the liens on the property in the district * * *." (Emphasis added.)

If this plan which was obviously designed for the purpose and actually had the effect of imposing liens on the property could be followed and yet remain classified as a purely voluntary "revenue bond" financing program, then the constitutional guarantees of due process of law and debt limits could be circumvented while effectively creating

---

[14]Adopted March 18, 1947, re-adopted October 6, 1952.

charges upon property. The district should not be permitted to accomplish by artifice, subterfuge or indirection what the law will not permit it to do openly and directly.[15]

It follows that the plaintiffs' contention No. 6, hereinabove set out, is well taken: that the requirements of due process of law have not been met.[16] Such conclusion renders it unnecessary and therefore inadvisable to prolong this opinion by considering and discussing plaintiffs' other contentions. This is more so because we are given to understand by counsel for both parties herein that certain amendatory and curative legislation is now pending before the legislature. It therefore may not be necessary to pass upon such other objections raised by plaintiffs.

The writ is made permanent.

WOLFE, C. J., and McDONOUGH, HENRIOD, and WADE, JJ., concur.

[15]*Utah Power & Light Co.* v. *Provo City*, 94 Utah 203, 74 P. 2d 1191, 1208.
[16]See cases Note 8, supra.