

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-7-1998

# Stern v. Halligan

Precedential or Non-Precedential:

Docket 97-5506

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Stern v. Halligan" (1998). *1998 Decisions.* Paper 240.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/240

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 7, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 97-5506

STEVEN B. STERN; MICHELE STERN;
THE LORENZO TRUST

v.

FRANCIS X. HALLIGAN, JR.; JEFFREY W. FLATT;
BERKELEY TOWNSHIP; BERKELEY TOWNSHIP
MUNICIPAL UTILITIES AUTHORITY

v.

FRANCIS X. HALLIGAN, JR; BERKELEY TOWNSHIP,
        Third-party plaintiffs

v.

MICHAEL PETER SCILLITANI,
        Third-party defendant
(Trenton D. C. Civil No. 95-cv-03449)

STEVEN B. STERN; MICHELE STERN;
THE LORENZO TRUST

v.

FRANCIS X. HALLIGAN, JR; JEFFREY W. FLATT;
BERKELEY TOWNSHIP; BERKELEY TOWNSHIP
MUNICIPAL UTILITIES AUTHORITY

v.

FRANCIS X. HALLIGAN, JR., BERKELEY TOWNSHIP,
        Third-party plaintiffs

v.

MICHAEL PETER SCILLITANI,
        Third-party defendant
(Trenton D. C. Civil No. 95-3885)

STEVEN B. STERN, MICHELE STERN,
THE LORENZO TRUST,
        Appellants

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civ. No. 95-cv-03449)

Argued: July 16, 1998

Before: BECKER, Chief Judge, STAPLETON, and
WEIS, Circuit Judges.

(Filed October 7, 1998)

        L. GILBERT FARR, ESQUIRE
          (ARGUED)
        193 East Bay Avenue
        P.O. Box 42, 2nd Floor
        Manahawkin, NJ 08050

        Attorney for Appellants

        PATRICK SHEEHAN, ESQUIRE
          (ARGUED)
        6 Hooper Avenue
        Toms River, NJ 08753

        Attorney for Appellees -
        Berkeley Township and
        Francis X. Halligan, Jr.

        JOHN J. SHEEHY, ESQUIRE
          (ARGUED)
        Sheehy & Sheehy
        665 Newark Avenue
        Jersey City, NJ 07306

        Attorney for Appellees -

Berkeley Township Municipal Utilities
Authority and Jeffrey W. Flatt

OPINION OF THE COURT

BECKER, Circuit Judge.

Plaintiffs Steven and Michele Stern, and Michele Stern's brother Michael Scillitani (as trustee), each own real property in Berkeley Township, New Jersey, which is served by privately-owned well water. Defendant Berkeley Township Municipal Utilities Authority ("BTMUA"), pursuant to local ordinances, ordered the plaintiffs to connect to the municipal water supply and, through various enforcement proceedings, placed a lien on the trust property administered by Michael Scillitani when he refused. Plaintiffs brought suit against BTMUA, the Township, and local officials, alleging that the mandatory connection requirement is unconstitutional, at least as applied to them, because it is beyond the powers of a municipality; because it constitutes a taking; and because it unlawfully forces them into an unwanted contract. The plaintiffs wish to avoid a connection to the municipal water supply with its attendant costs and to continue using their private wells for drinking and other household purposes. The district court granted summary judgment for the defendants, finding that there was a rational basis for the ordinances. We affirm.

I. Facts and Procedural History

Berkeley Township Ordinance 90-16-OAB requires that, within 90 days after a BTMUA water supply line is made available, property owners must hook up their buildings to the municipal system and must also permanently disconnect their private wells from the potable water supply for the buildings. See Berkeley Township, N.J., Ordinance 90-16-OAB S 2 (Apr. 23, 1990). The ordinance also allows BTMUA to make any required connection, installation, or well sealing if an owner fails to do so after receiving notice. The owner can be charged for such actions, and the

3

charges will be a lien on the owner's property until they are paid. See 90-16-OAB S 9. A second ordinance similarly authorizes BTMUA to charge property owners for connection and service charges "after the homeowner has received all notices to hook up to the water system and the time period for . . . connection has expired." Berkeley Township, N.J., Ordinance 94-23-OAB S 128-21 (June 28, 1994).

In 1994, both the Sterns and the trust received notice that BTMUA was to provide their properties with connection to the municipal water supply. In due course, both the Sterns and the trust received notice that the 90-day period for connecting to the water supply had expired and that they would be liable for all connection and service charges. In 1995, BTMUA issued summonses charging the trust with failure to connect to the water supply pursuant to township ordinance 94-23-OAB. A lien was imposed on the trust property. The plaintiffs then filed virtually identical pro se petitions in the district court for "a writ of protection" alleging violations of 18 U.S.C.S 241, 42 U.S.C. SS 1985(3) & 1983, and the Fifth and Ninth Amendments to the United States Constitution.

The defendants are BTMUA; the Township; Francis X. Halligan, Jr., the municipal court judge in Berkeley Township who arraigned Scillitani pursuant to the 1995 summonses; and Jeffrey Flatt, the BTMUA plant supervisor who issued the summonses. The defendants moved for summary judgment, which the district court granted. The plaintiffs, now represented by counsel, appeal only the ruling as it applies to their SS 1983 and 1985 claims.[1]

II. The Substantive Due Process Claim

The plaintiffs contend that Township Ordinance 90-16-

_____

1. The district court granted summary judgment on the 18 U.S.C. S 241 claim because there is no private cause of action under the criminal statute. See Newcomb v. Ingle, 827 F.2d 675, 677 n.1 (10th Cir. 1987). We note that, although the issue was not raised by the parties, all claims against the magistrate judge would have to be dismissed in any event on the grounds of judicial immunity.

4

OAB, which requires residents to hook up to the public water supply when it becomes available and to discontinue the use of well water in the home, violates the United States Constitution because their well water is "safe and pure."[2] They do not identify precisely what parts of the Constitution are thereby implicated, though we understand them to be making the claim that the ordinance is irrational and therefore violates substantive due process. In their reply brief, the plaintiffs also appear to invoke a general right to be free from government action by quoting Meyer v. Nebraska, 262 U.S. 390, 43 S. Ct. 625 (1922). Even if this claim had been preserved,[3] we do not consider the right to be free from municipal water connections to be part of the right to privacy as it has developed since Meyer. See Town of Ennis v. Stewart, 807 P.2d 179, 182 (Mont. 1991) (rejecting an identical claim).

We have made clear that when "general economic and social welfare legislation" is alleged to violate substantive due process, it should be struck down only when it fails to meet a minimum rationality standard, an "extremely difficult" standard for a plaintiff to meet. Knight v. Tape, Inc., 935 F.2d 617, 627 (3d Cir. 1991). The only question is "whether the law at issue bears any rational relationship to any interest that the state legitimately may promote," id.; simple unfairness will not suffice to invalidate a law. The challenger bears the burden of proving irrationality. See Lindsey Coal Mining Co. v. Chater, 90 F.3d 688, 694 (3d Cir. 1996).

_____

2. Neither side presents much evidence about the safety of the particular wells on the two properties. Plaintiffs' brief states that their water "has been tested and passed all tests with flying colors." However, the record does not contain any evidence of such testing. What little testimony there is in the record about well safety is in Jeffrey Flatt's affidavit, which states that there is a contaminated well approximately one half mile from the plaintiffs' properties. Moreover, the affidavit states that wells can become contaminated overnight. At all events, this case does not turn on these considerations.

3. A party cannot raise issues for the first time in a reply brief. See Republic of Philippines v. Westinghouse Elec. Corp., 43 F.3d 65, 71 n.5 (3d Cir. 1994); Kost v. Kozakiewicz, 1 F.3d 176, 182 (3d Cir. 1993).

The plaintiffs have not met their burden. Protecting the health, safety, and general welfare of township inhabitants, the goal of the challenged ordinances, is plainly in the public interest. Private wells can be unsafe for a disturbingly long list of reasons. Potential dangers include: carcinogenic radon, radium-226, and radium-228;[4] salt from road-salting stockpiles or saline aquifers; pesticides; fertilizers; explosive methane; MTBE (a gasoline additive); fuel from leaking underground tanks; bacteria-laden waste from leaking septic tanks, broken sewer lines, pets, farm animals, or wildlife; and chemical or other hazardous waste. See Roger M. Waller, U.S. Geological Survey, U.S. Dep't of Interior, Ground Water and the Rural Homeowner 20-30 (1994). Furthermore, private wells are generally shallower than public supply wells and thus more easily contaminated.

These potential harms provide ample justification for government action to safeguard citizens. Because pure water is a precondition for human health, regulating the water supply is a basic and legitimate governmental activity. See City of Trenton v. New Jersey, 262 U.S. 182, 43 S. Ct. 534 (1923); City of Newark v. Department of Health, 262 A.2d 718 (N.J. Super. Ct. App. Div. 1970). A municipal water supply replaces a myriad of private water sources that may be unmonitored or, at best, difficult, expensive, and inefficient to monitor. Therefore, a legislature may rationally conclude that a public water supply is the simplest and safest solution for its citizenry as a whole without proof of danger to each and every affected person. The danger is significant, the burden of connecting to nearby waterlines is not great, and the costs and benefits of such legislation are widely shared throughout the area of service. For these reasons, the

_____

4. Levels of radium and nitrate contamination are higher in private wells than in public supply wells. See U.S. Geological Survey, U.S. Dep't of Interior, Radium-226 and Radium-228 in Shallow Ground Water, Southern New Jersey, Fact Sheet FS-062-98, June 1998, at 5 & tbl.2. It also appears that contaminated private wells are a significant problem in many areas of New Jersey, including Ocean County, where the plaintiffs' property is located. See Maureen Graham & Frederick Cusick, Radium Tainting Water in N.J. Wells, Phila. Inquirer, Aug. 9, 1998, at A1.

overwhelming majority of courts that have addressed the
issue have found that mandatory connection to public
water is a legitimate exercise of police power. See, e.g.,
Shrader v. Horton, 471 F. Supp. 1236 (W.D. Va.), aff'd, 626
F.2d 1163 (4th Cir. 1979); Lepre v. D'Iberville Water &
Sewer Dist., 376 So. 2d 191 (Miss. 1979); Town of Ennis,
807 P.2d at 184; New Jersey v. Kusznikow, No. A–971–94T3
(N.J. Super. Ct. App. Div. Jan. 8, 1996); Rupp v. Grantsville
City, 610 P.2d 338 (Utah 1980); Tidewater Ass'n of
Homebuilders, Inc. v. City of Virginia Beach, 400 S.E.2d
523, 526 (Va. 1991); Weber City Sanitation Comm'n v. Craft,
87 S.E.2d 153, 159 (Va. 1955).

The only case supporting the plaintiffs' position is City of
Midway v. Midway Nursing & Convalescent Center, Inc.,
195 S.E.2d 452 (Ga. 1973).5 There, the Georgia Supreme
Court found that mandating a connection to a public water
supply was not a reasonable manner of protecting the
health and welfare of citizens. City of Midway has been
criticized by other courts for a crabbed understanding of
the scope of a municipality's police power over health and
safety issues. See, e.g., Town of Ennis, 807 P.2d at 182–83.
Moreover, City of Midway was decided under state law that
required grants of power to municipal corporations to be
construed strictly, see City of Midway, 195 S.E.2d at 454,
whereas we are evaluating only whether the ordinance
meets the minimum standards of rationality required of
social welfare regulation under the Due Process Clause.

_____

5. The plaintiffs also cite Frier v. City of Douglas, 213 S.E.2d 607 (Ga.
1975), for the proposition that safety concerns alone cannot justify a
mandatory connection ordinance. We cannot discern the difference
between "safety" and "health" in this situation, but even were we to find
the distinction persuasive, Frier would be inapposite. That case turned in
large part on the court's interpretation of the Georgia law at issue,
which
was worded restrictively in ways not present here. See id. at 609. Frier,
moreover, concerned electricity rather than water, and involved an owner
who wanted no electricity whatsoever. Here, the plaintiffs obviously want
to use water, but from their own source. The appropriate analogy is not
to Frier but to a case in which a homeowner wished to provide his or her
own electricity from a source that might without warning become unsafe;
in such a case the city would doubtless be able to require the
homeowner to use the public system if he or she wished to use electricity
at all.

7

We do not have the authority to second-guess rational legislative judgments of this sort. A legislature may be risk-averse even when there is no evidence of immediate harzard and some citizens are willing to run the risk of future harm. The Supreme Court of Virginia has upheld mandatory water connections even though the parties before the court stipulated that the plaintiffs' wells were currently safe:

> A local governing body must necessarily enjoy broad discretionary powers to protect the public health and general welfare of its residents. To anticipate seemingly unlikely events . . . as public health hazards may be to exercise commendable prudence and foresight. There is no requirement that protective measures be limited to actions taken after a crisis has arisen or a catastrophic disaster has struck.

McMahon v. City of Virginia Beach, 267 S.E.2d 130, 134 (Va. 1980). Similarly, the Supreme Court of Montana upheld a mandatory water connection law without evidence of immediate health threats to any well-water user in the affected area, because "the potential for such problems always exists. A municipal water system is better suited to meet these health concerns and prevent potential health problems that could arise absent such a system." Town of Ennis, 807 P.2d at 183.6

City of Midway distinguished sewers, which it thought sufficiently important to justify mandatory connection laws, from water, which it found mostly harmless. We may accept that sewers are even more vital than clean drinking water. However, cases addressing sewers also support the proposition that only a low level of risk is required to justify mandatory connections. In Hutchinson v. City of Valdosta, 227 U.S. 303, 33 S. Ct. 290 (1913), for example, although the Supreme Court posited that there was "no necessity on account of health or sanitary conditions" to require a sewer connection to the owner's land, id. at 305, and even noted the possibility that the construction of a sewer line might pose interim health hazards, the Court upheld the sewer

_____

6. We note that the town of Ennis, the self-proclaimed "Fly Fishing Capitol of America," is in the midst of the pristine "Big Sky Country," and yet still perceived the need for a municipal water supply.

8

connection requirement as a constitutional exercise of police power. See id.; see also Alperstein v. Three Lakes Water & Sanitation Dist., 710 P.2d 118 (Colo. Ct. App. 1985) (rejecting a requirement of individualized determination of sanitation risk for mandatory sewer connection); Bingham Farms v. Ferris, 384 N.W.2d 129, 133 (Mich. Ct. App. 1986) (same). As another court explained: "Municipal governments are not required to gamble against public health risks. To protect the public health, as well as to promote public safety, a legislative body may adopt `the most conservative course which science and engineering offer.' " City of Nokomis v. Sullivan, 153 N.E.2d 48, 51 (Ill. 1958) (quoting Queenside Hills Realty Co. v. Saxl, 328 U.S. 80, 83, 66 S.Ct. 850 (1946)).

The harms averted by sewer systems may well be greater than the harms averted by municipal water sources. But the plaintiffs have offered no evidence that the disparity in risk is sufficient to disregard these precedents. See Shrader, 471 F. Supp. at 1243 (finding "no meaningful distinction between mandatory sewer connection and mandatory water connection"); Lepre, 376 So. 2d at 193 (applying sewer connection precedents to a mandatory water connection ordinance).

The plaintiffs additionally claim that their case is distinct from other mandatory connection cases because the ordinance at issue may require them to cap or disconnect their wells in addition to requiring them to hook up to municipal water. We need not interpret the ordinance at this level of detail, however, because this slight additional burden makes no difference to the outcome of this case. Requiring disconnection of indoor water from a potentially dangerous source is part of the general protective legislative scheme and works no unjustifiable harm on the plaintiffs. See Renne v. Township of Waterford, 252 N.W.2d 842, 846 (Mich. Ct. App. 1977) (upholding a sewer connection requirement and a ban on the use of a functioning septic tank); Weber City Sanitation Comm'n (upholding a mandatory water connection and well disconnection ordinance); cf. Andres v. City of Perrysburg, 546 N.E.2d 1377, 1381 (Ohio Ct. App. 1988) (rejecting a takings claim for a mandatory sewer connection where local law also required all connected property to be annexed by the city).

9

Consequently, plaintiffs have no right to have their wells service their houses, even though the township has not proven that the wells are dangerous. Indeed, even if the plaintiffs can prove the current safety of their water, they would not be exempt from the generally applicable connection requirement. Mere over- or underinclusiveness will not invalidate social welfare regulation so long as the state action represents a rational response to a legitimate problem. See Lindsey Coal Mining Co., 90 F.3d at 694-95. Mandatory connections to public utilities are classic examples of social welfare regulations that merely adjust the burdens and benefits of life in the modern world. It cannot escape our notice that from the inception of such sanitary programs--and even during the Lochner era--courts have routinely rejected constitutional challenges to mandatory connection requirements. See, e.g., City of Mountain Home v. Ray, 267 S.W.2d 503 (Ark. 1954); Schmidt v. Village of Kimberly, 256 P.2d 515 (Idaho 1953) (collecting cases); Township of Bedford v. Bates , 233 N.W.2d 706 (Mich. Ct. App. 1975) (collecting cases); New Jersey v. Mayor of Paterson, 51 A. 922 (N.J. 1902); McNeill v. Harnell County, 398 S.E.2d 475 (N.C. 1990) (collecting cases); Bigler v. Greenwood, 254 P.2d 843 (Utah 1953).

In the end, the plaintiffs' apparently quite sincere belief that the ordinance represents an unjustified intrusion on their rights as citizens does not carry the day. Most laws appear intrusively burdensome to at least some of those whose conduct is thereby governed. But the legislature may respond to potential threats to the safety and welfare of its citizens, and may require even those who consider themselves careful or lucky enough to escape harm to comply with generally applicable laws.

III. The Takings Claim

The plaintiffs contend that their takings claim was not addressed by the district court, and that the matter should thus be remanded. It does not appear, however, that the issue was fairly presented to the district court. The pro se petition filed in district court contains numerous unexplained citations of various laws and cases, including a quotation of the Fifth Amendment in its entirety. The

10

relief sought did not include just compensation; instead, the petition sought to prevent the township from enforcing its ordinances and, in the alternative, demanded that the township accede to certain conditions (compensation for the well not among them) if connection were to be required. Although we construe the pro se petition liberally, see Haines v. Kerner, 404 U.S. 519, 520-21 (1972), we cannot find a takings claim. Moreover, we would lack subject matter jurisdiction over a takings claim, because plaintiffs must first exhaust state remedies before a federal court may entertain a regulatory takings claim. See Williamson County Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 105 S. Ct. 3108 (1985). The plaintiffs have not, so far as the record shows, sought compensation through state proceedings. Accordingly, plaintiffs' takings claim must be rejected.7

_____

7. Such a claim would be meritless in any event. The Supreme Court has noted that, after a finding that due process has not been violated, "it would be surprising indeed to discover a [regulatory] taking," because the relevant analysis is so similar. Connolly v. Pension Benefit Guaranty Corp., 475 U.S. 211, 223, 106 S. Ct. 1018 (1986). Moreover, regulatory taking, requiring just compensation therefor, occurs when there has been a deprivation of "all economically beneficial use" of property. Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1018, 112 S. Ct. 2886 (1992). The property at issue is not to be divided up between affected and unaffected parts; otherwise, every regulation would be a taking of the entirety of that which it prohibits. See Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 130, 98 S. Ct. 2646 (1978). There is no indication that the plaintiffs' wells constitute all (or, indeed, any) of the
economic value of their land. The value of the water pipes running from the plaintiffs' wells to their houses and of the limited amount of interior
plumbing affected by the disconnection does not begin to approach the total destruction of value required before we willfind a taking. See, e.g.,
Midnight Sessions, Ltd. v. City of Philadelphia, 945 F.2d 463, 468 (3d Cir. 1996) (taking a "narrow view" of regulatory takings); Elsmere Park Club Ltd. Partnership v. Town of Elsmere, 771 F. Supp. 646, 653 (D. Del. 1991) (holding that a regulation preventing the use of an apartment complex basement for residences was not a taking because so much of the property remained unaffected).

11

IV. The Contract Claim

The plaintiffs submit that they are being forced into a contract with BTMUA involuntarily. The plaintiffs briefly claim that the ordinance violates the federal and New Jersey state constitutional provisions prohibiting laws impairing the obligation of contracts. The argument is plainly lacking in merit, because the ordinance does not impair any contracts.

The plaintiffs then argue that general principles of contract law prohibit the township from charging fees for unwanted water service. Their claim is mistaken, because government is not required to deal with citizens on a purely contractual basis, as the mandatory connection cases discussed above demonstrate. The plaintiffs may be required to obtain their water service from BTMUA and to pay for that service just as they may be required to adhere to other laws that, one way or another, cost money. 8 The only forced contract is the broader social contract, which is part of the nation's polity and as such is unchallengable here.

Relying on New Jersey statutory law, the plaintiffs further argue that they may not be charged fees for utility service if they have not affirmatively applied for a service contract. The governing statute, however, lists contractual relations as only one of the potential sources of a payment obligation. Municipal authorities may collect fees for connection to and use of the water system from "any person contracting for . . . connection or use, products or services . . . or from the owner or occupant, or both of them, of any real property which directly or indirectly is or has been connected with the water system or to which directly or indirectly has been supplied or furnished such use, products or services of the water system . . . ." N.J.S.A. S 40:14B-21 (1991) (emphasis added). Therefore, upon connection, BTMUA is authorized to charge the owners for

_____

8. The situation here is similar to the requirement that automobile owners pay for annual inspections in order to drive their cars legally. The state, in establishing inspection centers, provides a service that owners must purchase if they wish to drive.

12

connection costs and water used, whether they want it or not.

To bolster their contractual claim, the plaintiffs cite Austin v. Mayor of Union Beach, 160 A. 318 (N.J. 1932), Ivan v. Marlboro Township Municipal Utilities Authority, 393 A.2d 598 (N.J. Super. Ct. App. Div. 1978), and Daniel v. Borough of Oakland, 304 A.2d 757 (N.J. Super. Ct. App. Div. 1973), in which municipalities did not connect the respective plaintiffs to the public water system and the plaintiffs had no contracts for service. In those cases the New Jersey courts found that the plaintiffs could not be assessed water service charges. Those cases are not on point, however, because they did not involve connection requirements; service was apparently voluntary.

Moreover, New Jersey law is clear that public utilities may require citizens to pay fees even if the citizens do not contract with the utilities. In Airwick Industries, Inc. v. Carlstadt Sewerage Authority, 270 A.2d 18 (N.J. 1970), the New Jersey Supreme Court decided that nonusers of a sewer system could be required to pay a share of system construction costs because they benefited from the existence of and potential connection to the system. When a municipality requires connection to a public utility, it is legitimate to require payment to cover both construction costs and use and maintenance charges. See also Mayor of Paterson (holding that a city may construct connections to link individual houses to a sewer and then charge the costs to the property thereby benefited).

The plaintiffs do not assert that the connection fee or the service fees are unreasonable.9 It is true that there is no

_____

9. The plaintiffs apparently argue that they may not be charged "water service" fees when a connection has not yet been made to their houses. This claim stems from New Jersey law, which provides that nonusers within the area of a municipal utility may be charged debt service fees but may not be charged for operation and maintenance costs or use fees unless they actually use the municipal services. See Airwick Indus., 270 A.2d at 25. The plaintiffs may be arguing that, even if they have to pay for the water connection, they cannot be charged for operation and maintenance costs and use fees until they have first been forced to make the connection. (It is difficult to ascertain the actual argument, because

13

indication in the record which ordinance, if any, specifies the rates for BTMUA. Nonetheless, this is not relevant to their claim, as municipal rate fixing is governed by the authorizing statute and general principles of reasonableness and uniformity. The New Jersey Supreme Court has held that municipalities have plenary statutory power to charge for sewer and water services, subject only to review for patent unreasonableness. See Meglino v. Township Comm., 510 A.2d 1134, 1138 (N.J. 1986).

V. Conclusion

One might sympathize with the plaintiffs' apparently sincere desire to maintain their own wells for their private use. Their grievances must, however, be addressed to the political branches, for we have no authority to upset rational, nondiscriminatory legislation addressing potential dangers to the health and safety of the community. We will affirm the judgment of the district court.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit
_____

the plaintiffs couple the invalid claim that they do not want a connection with the potentially valid claim that they do not currently have such a connection.) Unfortunately, the plaintiffs did not make this distinction in
the district court, where they attacked the ordinance in much broader terms. Furthermore, the record lacks any indication of whether or not they were charged operation and maintenance costs and use fees within the meaning of the law before connection was made. Nor did Airwick Industries address the case in which an owner wrongfully refuses connection and then claims immunity from paying the associated charges, because in Airwick Industries the New Jersey Supreme Court addresssed the claims of owners of unimproved land who had nothing to connect when the municipal authority began coverage of their land. See id. Thus, it would be inappropriate for us to interpret New Jersey law at this time or to opine whether the plaintiffs may have a more limited claim in state court, provided that it is not claim precluded.

14